

# EXHIBIT 1

COMMONWEALTH OF MASSACHUSETTS
The Trial Court
Superior Court Department

**Middlesex, ss.**

| | | |
|---|---|---|
| Sandra Padilla,<br>  Plaintiff | ) ) ) | **COMPLAINT**<br>and Jury Trial Demand |
| v. | ) ) | 8/31/2020 |
| Highgate Hotels, L.P. d/b/a<br>Courtyard by Marriott,<br>  Defendant | ) ) ) | JP<br>RECEIVED |

## INTRODUCTION

Defendant failed to accommodate the Plaintiff's high-risk pregnancy by refusing her a stool to sit on, scrutinizing her, yelling at her, threatening her, and disciplining her. Plaintiff was subjected to a hostile work environment because of her sex, pregnancy, and pregnancy-related disabilities. The work situation was so hostile that Plaintiff had a seizure on the job, fainted, started bleeding, and had to be taken to the hospital. Adding insult to injury, Defendant failed to return her to work after she filed an application for workers' compensation benefits for another on-the-job work injury. Plaintiff presents three claims: 1) sex discrimination; 2) handicap discrimination; and 3) workers' compensation retaliation. The particulars of the Plaintiff's allegations are as follows:

## PARTIES

1.     The plaintiff Sandra Padilla ("Ms. Padilla" or the "Plaintiff") is a female with a last and usual residence in East Boston, Suffolk County, Massachusetts.  At relevant times, Ms. Padilla was a resident of Malden, Middlesex County, Massachusetts.

2.     The defendant Highgate Hotels, L.P. d/b/a Courtyard by Marriott ("Highgate" or the "Defendant") is a real estate investment and hospitality management company with a principal place of business at 545 E. John Carpenter Freeway, Suite 1400, Irving, Texas 75062.  Highgate operates the Boston Marriott Cambridge, a hotel located at 777 Memorial Drive, Cambridge, Middlesex County, Massachusetts, where it employed the Plaintiff.

3.     Highgate operates more than 100 hotels and approximately 30,000 rooms in the United States and Europe.

4.     Highgate employed more than 6 employees at all relevant times.

### ADMINISTRATIVE AND JURISDICTIONAL
### PREREQUISITES TO SUIT

5.     Ms. Padilla timely filed a charge of discrimination with the Massachusetts Commission Against Discrimination on or about April 27, 2018.

6.     Ms. Padilla's charge was subsequently withdrawn in contemplation of bringing this action.

7.     This Court has jurisdiction over this matter pursuant to G.L. c. 151B, §9.

8.     Venue is proper in this county pursuant to G.L. c. 151B, §9, as the Plaintiff resided in this county at relevant times and worked for the Defendant in this county; and one or more of the acts of discrimination affected the Plaintiff in this county.

9.     All administrative and jurisdictional prerequisites to suit have been satisfied.

## FACTS

10.     Beginning on or about September 2016, Sandra Padilla was hired by the Defendant to work as a Front Desk Agent at the Boston Marriott Cambridge, located in Cambridge, Middlesex County, Massachusetts.

11.     Ms. Padilla's job performance was satisfactory or above at all relevant times.

12.     Ms. Padilla was never disciplined for any on-the-job misconduct and only received formal disciplinary action after she informed her employer about her pregnancy and her need for accommodation.

13.     On or about June 2017, Ms. Padilla became pregnant.

14.     On or about June 24, 2017, Ms. Padilla notified the Defendant that she was pregnant.  Specifically, Ms. Padilla told her supervisors, Simone Elliot and Matthew Shanley, about her pregnancy.

15.     For medical reasons, Ms. Padilla's pregnancy was considered to be "high risk".

16.     Ms. Padilla suffered from severe pregnancy complications, hyperemesis gravidarum (severe form of morning sickness) and placenta previa (when a pregnant woman's placenta blocks the opening to the cervix that allows the baby to be born), serious medical conditions that require medical care and treatment and can be life threatening.

17.     In July 2017, Ms. Padilla started experiencing symptoms of hyperemesis gravidarum, which caused her to go to the hospital. Ms. Padilla provided the Defendant with doctor notes, which stated that she needed to be out of work for a week at a time. She provided the doctor notes to her supervisors, Simone Elliot and Matthew Shanley, who provided them to Lindsey Samuels, then employed as the Property Manager for the Defendant.

18.     Ms. Padilla provided various medical notes to her employer, explaining that she was pregnant, that she had been diagnosed with hyperemesis gravidarum, and that she was undergoing medical treatment and attending medical appointments. Her medical notes refenced her pregnancy and her pelvic and abdominal pain as well as her significant nausea and vomiting.

19.     Prior to her pregnancy, Ms. Padilla successfully performed on the job, achieved excellent results, and got along well with customers, co-workers,

4

supervisors, and upper-level managers.  She was evaluated highly and praised for her work.

20.    After she became pregnant, Ms. Padilla experienced hostility from her managers, was subjected to unlawful threats, and was encouraged to quit her job.

21.    Ms. Padilla requested accommodations (including but not limited to the use of a stool to sit on at work).  Ms. Padilla observed the Defendant's displeasure in her requests for accommodation.

22.    Ms. Padilla also observed the Defendant's mounting displeasure in her use of sick time to care for herself when she experienced morning sickness while pregnant and suffered from other medical issues related to her pregnancy.

23.    Ms. Padilla repeatedly requested a stool to sit on in order to alleviate pressure (from standing) on her pelvic area.  Ms. Padilla also requested other medical accommodations and provided medical notes from her doctors.

24.    Plaintiff's requests for accommodation included but were not limited to:  no heavy lifting; taking frequent breaks; taking time off from work to attend necessary medical appointments; taking time out of work to rest and recover at home; and to be allowed the opportunity to sit down at work.

25.    The accommodations Ms. Padilla requested were simple, easy to administer, and free.  They amounted to little more than having the common

5

decency to give up your seat to a pregnant woman on the subway.  Yet, the Defendant failed to accommodate her, started issuing her formal written disciplinary action for the first time since she started working at the hotel, threatened to terminate her, suggested to her that she should quit her job, and harassed her to the point where she started bleeding during pregnancy on multiple occasions, fainted at work, and had to be taken to the hospital, fearing for her unborn baby.

26.     Defendant did not criticize Plaintiff's job performance, which was stellar, even while she was suffering from pregnancy-related disabilities.  Rather, Defendant took issue with Plaintiff needing time off from work and a stool to sit on due to her high-risk pregnancy.

27.     On or about August 31, 2017, Ms. Padilla spoke with Ms. Samuels who told her that she would be written up for being absent from work even though she had provided doctor's notes each time she was out.

28.     On or about August 31, 2017, Ms. Samuels also threatened Ms. Padilla that if this continued her employment would be terminated, and that it would be smart of Ms. Padilla to quit so that Ms. Samuels did not have to terminate her.

29.     In September 2017, Ms. Samuel left work early approximately twice in a week due to her pregnancy-related disability, hyperemesis gravidarum.

30.     On or about September 13, 2017, Ms. Padilla was written up by Ms. Samuels for calling out from her shifts in July and August 2017.  Ms. Samuels again told her that she should quit before she had to terminate her.

31.     The September 13, 2017 disciplinary action that was taken against the Plaintiff was the first formal disciplinary action taken against her throughout the course of her employment, and it was issued to the Plaintiff *after* she provided the Defendant with at least 6 medical notes relating to her high-risk pregnancy

32.     Ms. Padilla was highly scrutinized due to her pregnancy and/or her requests for accommodation.  Ms. Padilla was more closely scrutinized and monitored than her peers who were not pregnant.

33.     The scrutiny of Ms. Padilla included having a Human Resources representative watch her via security camera while she was working at the front desk to make sure that she was not sitting on a stool (a reasonable job accommodation she had requested).

34.     On or about September 26, 2017, Ms. Padilla's supervisor (Simone Elliot) told her that Alex Damp (Human Resources) had e-mailed her and told her that he could see Ms. Padilla from the camera and that she could not sit on a stool.

35.     Mr. Damp e-mailed Ms. Elliot twice, and after the second e-mail, she told Ms. Padilla that she was sorry, but she had to take the stool away.

7

36.    Ms. Padilla's supervisor (Ms. Elliot) then took the stool away.

37.    Three hours later, Ms. Padilla started bleeding a lot from the pain from standing, which was frightening as bleeding during pregnancy can be a sign of a miscarriage or other serious problem. Ms. Padilla had to leave work early, suffering physical pain and extreme emotional distress, due to her abdominal pain and bleeding.

38.    On or about September 27, 2017, Ms. Padilla went to the hospital. The hospital examined her and provided a medical note to the Defendant, confirming the bleeding and the hospital visit, and requesting accommodation, stating that Ms. Padilla needed to sit at the front desk and take frequent breaks.

39.    On or about October 29, 2017, Plaintiff was issued a written warning for leaving early in September 2017, but not for September 26, 2017. Plaintiff was again threatened with termination. Plaintiff's manager told the Plaintiff that her employment would be terminated if she received another written warning.

40.    On or about November 7, 2017, Ms. Padilla filed a grievance with her union. The grievance went to Alex Damp, who got very upset and yelled at her and the union representative. Mr. Damp kept saying that her health issues due to her pregnancy were her problem. Ms. Padilla became upset during the meeting and had a seizure, fainted, hit her head and belly, and was taken to the hospital.

41.     On or about November 13, 2017, Ms. Padilla went to a meeting with Mr. Damp and Ms. Samuels to discuss why he had taken the stool away from her in September 2017. Mr. Damp said that Ms. Padilla could not prove that he had sent the email and that nowhere in the law did it state that she could call out from work for being pregnant. During the meeting, FMLA was briefly mentioned, but she was not told what the process for applying was.

42.     On or about November 2017, Ms. Padilla hired an attorney who sent a letter to the Defendant reporting discrimination and asking that Ms. Padilla not be disciplined any further. In response, the Defendant denied Ms. Padilla's allegations and failed and refused to investigate, remedy or deter discrimination.

43.     Ms. Padilla went on maternity leave on or about February 2018.

44.     Ms. Padilla came back to work after her maternity leave, but later injured her back while on duty. Ms. Padilla then filed a claim for workers' compensation, which was denied by the Defendant. Rather, Ms. Padilla took an unpaid medical leave and has not been returned to work, even after being medically cleared to work by her doctors.

45.     Despite repeated requests to return to work and repeated promises that she would be returned to work, Defendant has failed and refused to return her to her former position or to otherwise put her on the work schedule.

46.    Plaintiff has been damaged by the Defendant's acts and omissions.

### CLAIMS

### COUNT I
*Sex/Pregnancy Discrimination*
**G.L. c. 151B, §§4(1, 4A and 5)**

Plaintiff realleges, reasserts, and incorporates by reference the facts and allegations stated in the previous paragraphs.

47.    By its conduct, as more particularly described above, the Defendant discriminated against the Plaintiff in the terms and conditions of her employment on account of her sex and her pregnancy in violation of G.L. c. 151B, §4(1).

48.    Defendant discriminated against Ms. Padilla based on her sex, female.

49.    Defendant discriminated against Ms. Padilla based on her pregnancy.

50.    Defendant's treatment of Ms. Padilla was motivated by her sex and pregnancy.

51.    Defendant's conduct in violation of law, as more particularly set forth above, was willful, or, in the alternative, carried out in reckless disregard for Ms. Padilla's rights and the Defendant's corresponding duties.

52.    Defendant's conduct, as more particularly described above, violated G.L. c. 151B, §4.

53.    Defendant's conduct, as more particularly described above, subjected the Plaintiff to disparate treatment based on her sex.

54.    Defendant treated Ms. Padilla differently than her male co-workers because she was a pregnant woman, and they adhered to the stereotype that pregnant women are substandard employees.

55.    Defendant disciplined Ms. Padilla and threatened her because of her sex and/or pregnancy.

56.    By its conduct, as more particularly described above, the Defendant discriminated against the Plaintiff, Ms. Padilla, in the terms and conditions of her employment on account of her sex and pregnancy in violation of G.L. c. 151B, §4(1 and 4A).

57.    Defendant's conduct, as more particularly described above, created a hostile work environment based on Plaintiff's sex/pregnancy.

58.    Ms. Padilla has been substantially damaged by the defendants' acts and omissions including, but not limited to loss of wages, benefits, reputation, and earning capacity, emotional distress, physical harm, and attorney's fees and costs.

59.    Defendant is liable to Ms. Padilla for the violations set forth above.

11

## COUNT II
### *Handicap Discrimination*
### G.L. c. 151B, §4(16)

Plaintiff realleges, reasserts, and incorporates by reference the facts and allegations stated in the previous paragraphs.

60.    Ms. Padilla was at all relevant times handicapped or perceived to be handicapped within the meaning of G.L. c. 151B, §1(17).

61.    Plaintiff was at all relevant times qualified for her job within the meaning of G.L. c. 151B, §1(16).

62.    Plaintiff was at all relevant times able to perform the essential functions of her job with or without reasonable accommodation.

63.    By its conduct, as more particularly described above, Defendant discriminated against the Plaintiff in the terms and conditions of her employment on account of her perceived/real handicap in violation of G.L. c. 151B, §4(16).

64.    By its conduct, as more particularly described above, Defendant failed to engage in an interactive process and/or reasonably accommodate Ms. Padilla's perceived/real handicap.

65.    Defendant unlawfully threatened the Plaintiff and tried to get her to quit her job because of her perceived/real handicap in violation of the law.

66.    Defendant unlawfully disciplined the Plaintiff because of her perceived/real handicap in violation of the law.

12

67.     Defendant subjected the Plaintiff to a hostile work environment because of her perceived/real handicap.

68.     Defendant subjected the Plaintiff to disparate treatment because of her perceived/real handicap.

69.     Defendant failed and refused to return the Plaintiff to work because of her perceived/real handicap.

70.     Defendant's conduct, as more particularly described above, was willful and knowing.

71.     Defendant failed or refused to adequately, promptly, and fairly investigate and remedy Ms. Padilla's complaints of discrimination.

72.     Plaintiff was harmed by the Defendant's failure to adequately investigate and remedy her complaints of discrimination.

73.     Defendant's failure to adequately investigate and remedy Ms. Padilla's complaints violates M.G.L. c. 151B.

74.     Ms. Padilla has been damaged by the Defendant's acts and omissions as more particularly set forth above.

75.     Defendant is liable to Ms. Padilla for the violations set forth above.

**COUNT III**
**Workers' Compensation Retaliation, in violation of**
**G.L. 152, §75B**

13

Plaintiff realleges, reasserts, and incorporates by reference the facts and allegations stated in the previous paragraphs.

76.    Defendant unlawfully retaliated against the Plaintiff for her protected activity under the Massachusetts Workers' Compensation Act, G.L. c. 152, §1.

77.    By its conduct, as more particularly described above, the Defendant violated G.L. c. 152, §75B by discharging, refusing to hire, or otherwise discriminating against the Plaintiff because she applied for workers' compensation benefits.

78.    Defendant knew or should have known that it was retaliating against the Plaintiff on the basis of her application for workers' compensation benefits.

79.    Defendant failed and refused to return the Plaintiff to work in retaliation for her application for workers' compensation benefits.

80.    Defendant's conduct in violation of law, as more particularly set forth above, would not have occurred but for the Plaintiff's application for workers' compensation benefits.

81.    Defendant's' conduct, as more particularly described above, caused the Plaintiff substantial damage, including, but not limited to, loss of wages, benefits, reputation, and earning capacity, emotional distress, physical harm, and attorney's fees and costs.

14

**WHEREFORE,** Plaintiff respectfully requests that this Court declare that the Defendant violated the law and order:

a.   that the Defendant cease and desist from any further discriminatory actions;

b.   that the Plaintiff be compensated for any loss of wages, back pay, and/or benefits incurred as a result of the unlawful acts;

c.   that the Plaintiff be compensated for any future loss of wages, front pay, and/or benefits incurred as a result of the unlawful acts;

d.   that the Plaintiff be awarded an amount of money which will fairly compensate her for her emotional and physical pain and suffering and for damage to her reputation and earning capacity;

e.   that the Defendant pay the Plaintiff's costs and attorney's fees resulting from this action;

f.   that the Defendant pay the Plaintiff interest;

g.   that the Defendant be ordered to pay the Plaintiff punitive/multiple/liquidated damages; and

h.   such additional relief as may be just and proper and/or will make the plaintiff whole, including but not limited to equitable relief, as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all applicable issues.

Respectfully submitted,
Sandra Padilla,
Plaintiff,
By her attorney,

Lori A. Jodoin
BBO # 655840
lori@theemploymentlawyers.com
Powers, Jodoin, Margolis & Mantell LLP
111 Devonshire Street, Suite 400
Boston, MA 02109
(617) 742-7010
(617) 742-7225 (fax)
www.theemploymentlawyers.com

Dated:  August 31, 2020

# EXHIBIT 2

*A TRUE COPY ATTEST*
*DAVID D. AYLES, PROCESS SERVER*
*AND DISINTERESTED PERSON*

## Commonwealth of Massachusetts

MIDDLESEX,SS.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL DOCKET NO. 2081-CV-02121

Sandra Padilla, PLAINTIFF(S),

v. Highgate Hotels, L.P. d/b/a
Courtyard by Marri DEFENDANT(S)

**SUMMONS**

THIS SUMMONS IS DIRECTED TO Highgate Hotels, L.P. d/b/a Courtyard by Marriott. (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the Middlesex Superior Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1.  **You must respond to this lawsuit in writing within 20 days.** If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2.  **How to Respond.** To respond to this lawsuit, you must file a written response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

    a.  Filing your signed original response with the Clerk's Office for Civil Business, Middlesex Superior Court, 200 Trade Center, 2nd Floor, Woburn, MA 01801 (address), by mail or in person, **AND**

    b.  Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address: Powers, Jodoin, Margolis and Mantell LLP, 111 Devonshire Street, Boston, MA 02109

3.  **What to include in your response.** An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Answer or in a written demand for a jury trial that you must send to the other side and file with the court no more than 10 days after sending your Answer. You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under Mass. R. Civ. P. 12. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at www.mass.gov/courts/case-legal-res/rules of court.

4.  **Legal Assistance.** You may wish to get legal help from a lawyer.  If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5.  **Required Information on all filings:** The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Judith Fabricant, Chief Justice on_____ 23 _____, 2020.

_____

Michael A. Sullivan
Clerk-Magistrate

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

## PROOF OF SERVICE OF PROCESS

I hereby certify that on_____, 20____, I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated:_____, 20____         Signature:_____

N.B.    TO PROCESS SERVER:

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

11/24   , 20 20

# EXHIBIT 3

| CIVIL ACTION COVER SHEET | DOCKET NUMBER 20-2121 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| PLAINTIFF(S): Sandra Padilla | COUNTY Middlesex |
|---|---|
| ADDRESS: 430 Border Street, Apt. E | |
| East Boston, MA 02128 | DEFENDANT(S): Highgate Hotels, L.P. d/b/a Courtyard by Marriott |

| ATTORNEY: Lori A. Jodoin, Esq. | |
|---|---|
| ADDRESS: Powers, Jodoin, Margolis & Mantell LLP | ADDRESS: 545 E. John Carpenter Freeway, Suite 1400 |
| 111 Devonshire Street, Suite 400 | Irving, Texas 75062 (operating the Boston Marriott Cambridge, 777 Memorial Drive, Cambridge, MA |
| Boston, MA 02109 | |
| BBO: 655840 | |

**TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B22 | Employment Discrimination | F | ☒ YES ☐ NO |

*If "Other" please describe:

| Is there a claim under G.L. c. 93A? ☐ YES ☒ NO | Is this a class action under Mass. R. Civ. P. 23? ☐ YES ☒ NO |
|---|---|

**STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(attach additional sheets as necessary)

A. Documented medical expenses to date:
    1. Total hospital expenses ................................................................. $
    2. Total doctor expenses ................................................................. $
    3. Total chiropractic expenses ................................................. $
    4. Total physical therapy expenses ....................................... $
    5. Total other expenses (describe below) .............................. $
                                          Subtotal (A): $

FILED
IN THE OFFICE OF THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX

SEP 0 2 2020

CLERK

B. Documented lost wages and compensation to date ................................................ $
C. Documented property damages to date ........................................................................ $
D. Reasonably anticipated future medical and hospital expenses ............................. $
E. Reasonably anticipated lost wages ............................................................................. $
F. Other documented items of damages (describe below) .......................................... $

G. Briefly describe plaintiff's injury, including the nature and extent of injury:
Lost wages, benefits, and severe emotional distress due to harassment while pregnant, resulting in being taken to hospital.

TOTAL (A-F):$350,000.00+

Defendant issued unlawful discipline, threats of termination, and failed to return Plaintiff to work despite medical clearance.

**CONTRACT CLAIMS**
(attach additional sheets as necessary)

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).
Provide a detailed description of claim(s):

TOTAL: $

Signature of Attorney/ Unrepresented Plaintiff: X _Lori C. Jodoin_     Date: 8/31/2020

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

N/A

**CERTIFICATION PURSUANT TO SJC RULE 1:18**

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X _Lori C. Jodoin_     Date: 8/31/2020



**EXHIBIT 4**

COMMONWEALTH OF MASSACHUSETTS
The Trial Court
Superior Court Department

Middlesex, ss.
2081-cv-02121

Sandra Padilla,          )
     Plaintiff        )
                )
      v.        )
                )
Highgate Hotels, L.P. d/b/a   )
Courtyard by Marriott,    )
     Defendant        )

## MOTION FOR APPOINTMENT AS SPECIAL PROCESS SERVER AND ORDER OF APPOINTMENT

In accordance with the provisions of Rule 4(c) of the M.R.C.P., the undersigned hereby motions this Honorable Court for the appointment of QUICKSERVE ALLSTATE PROCESS SERVERS as process server in the above-entitled action. The undersigned swears that to the best of her knowledge and belief the person to be appointed process server is a Constable who is experienced in the service of process, is 18 years of age or over and is not a party to this action.

11/23/2020   Motion Allowed

Attest: _____
                Deputy Assistant Clerk

( Deakin _____ J.)

# EXHIBIT 5

| CIVIL TRACKING ORDER<br>(STANDING ORDER 1- 88) | DOCKET NUMBER<br>2081CV02121 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

| CASE NAME:<br>Padilla, Sandra vs. Highgate Hotels, L.p. D/B/A Courtyard By Marriott | Michael A. Sullivan, Clerk of Court<br>Middlesex County |
|---|---|
| TO: File Copy | COURT NAME & ADDRESS<br>Middlesex County Superior Court - Woburn<br>200 Trade Center<br>Woburn, MA 01801 |

### TRACKING ORDER – F - Fast Track

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

| STAGES OF LITIGATION | DEADLINE | | |
|---|---|---|---|
| | SERVED BY | FILED BY | HEARD BY |
| Service of process made and return filed with the Court | | 11/30/2020 | |
| Response to the complaint filed (also see MRCP 12) | | 12/31/2020 | |
| All motions under MRCP 12, 19, and 20 | 12/31/2020 | 02/01/2021 | 03/01/2021 |
| All motions under MRCP 15 | 12/31/2020 | 02/01/2021 | 03/01/2021 |
| All discovery requests and depositions served and non-expert depositions completed | 06/29/2021 | | |
| All motions under MRCP 56 | 07/29/2021 | 08/30/2021 | |
| Final pre-trial conference held and/or firm trial date set | | | 12/27/2021 |
| Case shall be resolved and judgment shall issue by | | | 09/02/2022 |

**The final pre-trial deadline is not the scheduled date of the conference.** You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to

| DATE ISSUED<br>09/02/2020 | ASSISTANT CLERK<br>**Martha Fulham** | | PHONE<br>**(781)939-2760** |
|---|---|---|---|

Date/Time Printed: 09-02-2020 11:29:22                                                                 SCV026\ 08/2018



**EXHIBIT 6**

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO. 2081CV02121

|  |  |
|---|---|
| SANDRA PADILLA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HIGHGATE HOTELS, L.P. d/b/a | ) |
| COURTYARD BY MARRIOT, | ) |
| | ) |
| Defendant. | ) |

### NOTICE OF APPEARANCE

Please enter the appearance of Patrick M. Curran, Jr. of Ogletree, Deakins, Nash, Smoak

& Stewart, P.C. as counsel for Defendant Highgate Hotels, L.P. in the above referenced matter.

Respectfully submitted,

**HIGHGATE HOTELS, L.P.**

By its attorneys,

/s/ Patrick M. Curran, Jr.
Patrick M. Curran, Jr. (BBO #659322)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
Telephone: (617) 994-5700
patrick.curran@ogletreedeakins.com

Dated: December 14, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2020 a true and correct copy of the foregoing document was served by e-mail upon counsel for Plaintiff, as follows:

Lori A. Jodoin, Esq.
lori@theemploymentlawyers.com

/s/ Patrick M. Curran, Jr.
Patrick M. Curran, Jr.

45279848.1



EXHIBIT 7

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO. 2081CV02121

SANDRA PADILLA,                          )
                                         )
            Plaintiff,                   )
                                         )
v.                                       )
                                         )
HIGHGATE HOTELS, L.P. d/b/a              )
COURTYARD BY MARRIOT,                    )
                                         )
            Defendant.                   )
                                         )

## DEFENDANT'S ASSENTED-TO MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFF'S COMPLAINT

Pursuant to Rule 6(b) of the Massachusetts Rules of Civil Procedure, Defendant

Highgate Hotels, L.P. hereby moves for an extension of time – to December 18, 2020 – within

which to file a pleading or motion in response to Plaintiff Sandra Padilla's Complaint and

Demand for Jury Trial (the "Complaint"). As grounds for this Motion, Defendant states as

follows:

1.    The current deadline for Defendant's response to the Complaint is December 14,

2020.

2.    Counsel for the Defendant requires additional time to investigate the allegations

and to complete their preparation of Defendant's response to the Complaint.

3.    Accordingly, Defendant requests a four-day extension of the deadline—from

December 14, 2020, to December 18, 2020—so that its counsel will have sufficient time to

complete their preparation of Defendant's response.

4.     This request for extension of time is made for good cause, and not for purposes of delay or harassment, and no party will be prejudiced by the requested relief.

5.     Plaintiff, through her counsel, has assented to the relief requested in this Motion.

WHEREFORE, Defendant respectfully requests that the Court grant it an extension of time, to December 18, 2020, to file a pleading or motion in response to the Complaint pursuant to Mass. R. Civ. P. 12.

Respectfully submitted,

**HIGHGATE HOTELS, L.P.**

By its attorneys,

/s/ Patrick M. Curran, Jr.
Patrick M. Curran, Jr. (BBO #659322)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
Telephone: (617) 994-5700
patrick.curran@ogletreedeakins.com

Assented to:

**SANDRA PADILLA**

By her attorney,

/s/ Lori A. Jodoin
Lori A. Jodoin
BBO # 655840
lori@theemploymentlawyers.com
Powers, Jodoin, Margolis & Mantell LLP
111 Devonshire Street, Suite 400
Boston, MA 02109
(617) 742-7010
(617) 742-7225 (fax)

Dated:  December 14, 2020

## <u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on December 14, 2020 a true and correct copy of the foregoing document was served by e-mail upon counsel for Plaintiff, as follows:

                Lori A. Jodoin, Esq.
                lori@theemploymentlawyers.com

                                /s/ Patrick M. Curran, Jr.
                                Patrick M. Curran, Jr.

45278616.1



**EXHIBIT 8**

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss
SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO. 2081CV02121

|  |  |
|---|---|
| SANDRA PADILLA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HIGHGATE HOTELS, L.P. d/b/a | ) |
| COURTYARD BY MARRIOT, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S CORPORATE DISCLOSURE STATEMENT

Pursuant to Supreme Judicial Court Rule 1:21, Defendant Highgate Hotels, L.P.

("Highgate") states as follows:  Highgate is a Delaware Limited Partnership. Highgate's General

Partner is Highgate Hotels GP LLC, a Delaware Limited Liability Company. No publicly-traded

company owns 10% or more of Highgate's stock.

Respectfully submitted,

**HIGHGATE HOTELS, L.P.**

By its attorneys,

/s/ Patrick M. Curran, Jr.
Patrick M. Curran, Jr. (BBO #659322)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
Telephone: (617) 994-5700
patrick.curran@ogletreedeakins.com

Dated:  December 14, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 14, 2020 a true and correct copy of the foregoing document was served by e-mail upon counsel for Plaintiff, as follows:

Lori A. Jodoin, Esq.
lori@theemploymentlawyers.com

/s/ Patrick M. Curran, Jr.
Patrick M. Curran, Jr.

45279679.1

# EXHIBIT 9

7

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO. 2081CV02121

|  |  |  |
|---|---|---|
| SANDRA PADILLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 12/18/2020 |
| v. | ) | |
| | ) | |
| HIGHGATE HOTELS, L.P. d/b/a | ) | |
| COURTYARD BY MARRIOT, | ) | RECEIVED |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT
AND JURY TRIAL DEMAND**

Pursuant to Mass. R. Civ. P. 8, Defendant Highgate Hotels, L.P. ("Defendant") responds to the allegations in Plaintiff Sandra Padilla's Complaint and Jury Trial Demand (the "Complaint") as follows:

No response is required to the allegations contained in the unnumbered paragraph that appears on the first page of the Complaint because Plaintiff has failed therein to comply with the requirement of Mass. R. Civ. P. 10(b) that "[a]ll averments of claim . . . shall be made in numbered paragraphs," because certain of the allegations contained therein set forth legal conclusions to which no response is required, and because certain of the remaining allegations purport to restate the terms of written documents, which speak for themselves. To the extent that a response to the allegations contained in the unnumbered paragraph that appears on the first page of the Complaint is required, Defendant denies them except to the extent that they accurately characterize, represent, or set forth the contents of written documents.

## PARTIES

1.      Defendant admits only, on information and belief, that Plaintiff is a female, that she resides in East Boston, Suffolk County, Massachusetts, and that she has in the past resided in Malden, Middlesex County, Massachusetts. Defendant is without knowledge or information sufficient to form a belief as to what period(s) of time Plaintiff means when she refers to "relevant times," and it therefore cannot admit or deny Plaintiff's allegations with respect to any such time periods. Defendant denies any and all remaining allegations contained in Paragraph 1 of the Complaint.

2.      Admitted.

3.      Defendant admits only that it operates more than 100 hotels, some of which are in the United States. Defendant denies any and all remaining allegations contained in Paragraph 3 of the Complaint.

4.      Defendant is without knowledge or information sufficient to form a belief as to what period(s) of time Plaintiff means when she refers to "all relevant times," and it therefore cannot admit or deny Plaintiff's allegations with respect to any such period(s) of time. Further answering, Defendant states that at all times during the course of Plaintiff's employment with Defendant, it has employed more than 6 employees.

## ADMINISTRATIVE AND JURISDICTIONAL
## PREREQUISITES TO SUIT

5.      Defendant admits only that, on information and belief, Plaintiff filed a charge of discrimination with the Massachusetts Commission Against Discrimination on or about April 27, 2018. The remaining allegations contained in Paragraph 5 set forth legal conclusions to which no response is required; to the extent that a response to those allegations is required, Defendant denies them.

6.      Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6 of the Complaint.

7.      The allegations contained in Paragraph 7 of the Complaint set forth legal conclusions to which no response is required. To the extent that a response to those allegations is required, Defendant states that it does not contest the Court's jurisdiction over the subject matter of this action.

8.      Defendant admits only that Plaintiff worked for Defendant in Middlesex County, Massachusetts and that (on information and belief) she has in the past resided in Middlesex County, Massachusetts. Defendant is without knowledge or information sufficient to form a belief as to what period(s) of time Plaintiff means when she refers to "relevant times," and it therefore cannot admit or deny Plaintiff's allegations with respect to any such period(s) of time. Certain of the remaining allegations contained in Paragraph 7 set forth legal conclusions to which no response is required; to the extent that a response is required, Defendant states that it does not contest venue in this matter. Defendant denies any and all remaining allegations contained in Paragraph 8, including without limitation the allegation that Defendant committed one or more acts of discrimination that affected Plaintiff in Middlesex County.

9.      The allegations contained in Paragraph 9 set forth legal conclusions to which no response is required. To the extent that a response to those allegations is required, Defendant states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations.

## FACTS

10.     Defendant admits only that it hired Plaintiff to work at the Boston Marriott Cambridge (the "Hotel"), and that the Hotel is located in Cambridge, Middlesex County, Massachusetts. Defendant denies any and all remaining allegations contained in Paragraph 10 of

the Complaint. Further answering, Defendant states that it hired Plaintiff to work at the Hotel as a Guest Services Agent in October 2016.

11.     Defendant is without knowledge or information sufficient to form a belief as to what period(s) of time Plaintiff means when she refers to "all relevant times," and it therefore cannot admit or deny Plaintiff's allegations with respect to any such period(s) of time. Further answering, Defendant states that Ms. Padilla's job performance has been unsatisfactory during various periods of time during the course of her employment with Defendant.

12.     Defendant is without knowledge or information sufficient to form a belief as to what Plaintiff means when she refers to "on-the-job misconduct," and it therefore cannot admit or deny Plaintiff's allegations with respect to such misconduct. Defendant denies any and all remaining allegations contained in Paragraph 12 of the Complaint.

13.     Defendant admits only that, on information and belief, Ms. Padilla became pregnant at some point in 2017. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 13 of the Complaint.

14.     Defendant admits only that, to the best of its knowledge, information, and belief, Ms. Padilla notified Defendant of her pregnancy on or about July 14, 2017. Defendant is without knowledge or information sufficient to form a belief as to the truth of her allegations concerning the content of her alleged conversations with Simone Elliot and Matthew Shanley, or concerning the date(s) on which those alleged conversations occurred. Defendant denies any and all remaining allegations contained in Paragraph 14 of the Complaint.

15.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15 of the Complaint.

16.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 of the Complaint.

17.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 17 of the Complaint. The allegations contained in the second sentence of Paragraph 17 purport to characterize or restate the terms of written documents, which speak for themselves; Defendant denies those allegations to the extent that they vary, misrepresent, misstate, or improperly characterize the contents of those documents. In response to the allegations contained in the third sentence of Paragraph 17, Defendant admits only that during the period from July 2017 through September 2017, it received several written communications from medical providers concerning Ms. Padilla, and that Defendant employed Lindsey Samuels as the Hotel's Property Manager during that period. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 17.

18.     Defendant admits only that, during the course of Plaintiff's employment at the Hotel, it received several written communications from medical providers concerning Ms. Padilla. The remaining allegations contained in Paragraph 18 purport to characterize or restate the terms of written documents, which speak for themselves; Defendant denies those allegations to the extent that they vary, misrepresent, misstate, or improperly characterize the contents of those documents.

19.     Defendant admits only that, to the best of its knowledge, information, and belief, (a) Plaintiff got along reasonably well with customers, co-workers, supervisors, and upper-level managers before, during, and after her pregnancy, and (b) aside from repeated violations of Defendant's attendance policy, when she was not on leave Plaintiff generally performed her job duties adequately during her employment for Defendant. Defendant denies the allegations

contained in Paragraph 19 of the Complaint to the extent that they vary from or are inconsistent with the admissions contained in this Paragraph, and further denies any and all remaining allegations contained Paragraph 19 of the Complaint.

20.     Defendant denies the allegations contained in Paragraph 20 of the Complaint as written.

21.     Defendant admits the allegations contained in the first sentence of Paragraph 21 of the Complaint. Defendant denies any and all remaining allegations contained in Paragraph 21.

22.     Defendant denies the allegations contained in Paragraph 22 of the Complaint as written.

23.     Defendant admits only that Plaintiff requested permission to sit on a stool while working, that Plaintiff requested other accommodations, and that Defendant received written communications from medical providers concerning Ms. Padilla. Defendant denies the allegations contained in Paragraph 23 of the Complaint to the extent that they vary from or are inconsistent with the admissions contained in this Paragraph, and further denies any and all remaining allegations contained Paragraph 23 of the Complaint.

24.     Some or all of the allegations contained in Paragraph 24 purport to characterize or restate the terms of written documents, which speak for themselves; Defendant denies those allegations to the extent that they vary, misrepresent, misstate, or improperly characterize the contents of those documents. To the extent that any of the allegations contained in Paragraph 24 do not purport to characterize or restate the terms of written documents, Defendant denies them.

25.     Defendant denies the allegations contained in Paragraph 25 of the Complaint as written.

26.     Defendant denies the allegations contained in Paragraph 26 of the Complaint as written.

27.     Defendant admits only that Ms. Samuels met with Plaintiff on or about August 31, 2017. Defendant denies any and all remaining allegations contained in Paragraph 27 of the Complaint.

28.     Defendant denies the allegations contained in Paragraph 28 of the Complaint as written.

29.     Defendant denies the allegations contained in Paragraph 29 of the Complaint as written.

30.     Defendant admits only that on or about September 13, 2017, Plaintiff received a written warning for violating the Hotel's attendance policy. Defendant denies the allegations contained in Paragraph 30 of the Complaint to the extent that they vary from or are inconsistent with the admissions contained in this Paragraph, and further denies any and all remaining allegations contained Paragraph 30 of the Complaint.

31.     Defendant denies the allegations contained in Paragraph 31 of the Complaint as written.

32.     Defendant denies the allegations contained in Paragraph 32 of the Complaint as written.

33.     Defendant denies the allegations contained in Paragraph 33 of the Complaint as written.

34.     Defendant denies the allegations contained in Paragraph 34 of the Complaint as written. Further answering, Defendant states that Plaintiff first submitted documentation from a medical provider indicating that she "should be allowed the opportunity to sit down at work when she requests to do so" on or after September 27, 2020, that Plaintiff was nevertheless permitted to sit during shifts before Defendant received such documentation, and that Plaintiff was permitted to sit during her shifts after Defendant received such documentation.

35.     Defendant admits only that, during the course of his employment with Highgate, Mr. Damp sent a number of e-mails to Ms. Elliott on a variety of topics. Defendant denies the remaining allegations contained in Paragraph 35 as written. Further answering, Defendant states that Plaintiff first submitted documentation from a medical provider indicating that she "should be allowed the opportunity to sit down at work when she requests to do so" on or after September 27, 2020, that Plaintiff was nevertheless permitted to sit during shifts before Defendant received such documentation, and that Plaintiff was permitted to sit during her shifts after Defendant received such documentation.

36.     Defendant denies the allegations contained in Paragraph 36 of the Complaint as written. Further answering, Defendant states that Plaintiff first submitted documentation from a medical provider indicating that she "should be allowed the opportunity to sit down at work when she requests to do so" on or after September 27, 2020, that Plaintiff was nevertheless permitted to sit during shifts before Defendant received such documentation, and that Plaintiff was permitted to sit during her shifts after Defendant received such documentation.

37.     Defendant admits only that on or about September 26, 2017, Plaintiff left work before the end of her scheduled shift. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 37 of the Complaint.

38.     Defendant admits only that on or after September 27, 2017, it received a written communication from a medical provider (dated September 27, 2017) concerning Plaintiff. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 38 of the Complaint, and of the allegation in the second sentence of Paragraph 38 that "[t]he hospital examined her." The remaining allegations contained in Paragraph 38 purport to characterize or restate the terms of a written

document, which speaks for itself; Defendant denies those allegations to the extent that they vary, misrepresent, misstate, or improperly characterize the contents of that document.

39.     Defendant admits only that on or about October 30, 2017, Plaintiff received a final warning based on multiple violations of the Hotel's attendance policy in September 2017 and October 2017, and that in connection with that warning Plaintiff was informed that if she were to continue violating Hotel policies, rules, or regulations, she would be subject to further disciplinary action up to and including termination of employment. Defendant denies the allegations contained in Paragraph 39 of the Complaint to the extent that they vary from or are inconsistent with the admissions contained in this Paragraph, and further denies any and all remaining allegations contained Paragraph 39 of the Complaint.

40.     Defendant admits, on information and belief, the allegations contained in the first sentence of Paragraph 40 of the Complaint. Defendant denies any and all remaining allegations contained in Paragraph 40.

41.     Defendant admits only that on or about November 13, 2017, Plaintiff met with Alex Damp, Lindsay Samuels, and several other individuals, including Union shop steward Nelson Rodrigues. Defendant denies the allegations contained in Paragraph 41 of the Complaint to the extent that they vary from or are inconsistent with the admissions contained in this Paragraph, and further denies any and all remaining allegations contained Paragraph 41 of the Complaint.

42.     Defendant admits only that in late December 2017, the Hotel received a letter from Eliza J. Minsch, Esq., who stated that she had been retained by Plaintiff, and that on January 3, 2018, the Hotel (through its counsel) sent a response to Ms. Minsch's letter. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegation that Plaintiff hired Ms. Minsch. The remaining allegations contained in Paragraph 42

purport to characterize or restate the terms of written documents, which speak for themselves; Defendant denies those allegations to the extent that they vary, misrepresent, misstate, or improperly characterize the contents of those documents.

43.     Admitted.

44.     Defendant admits only (a) that Plaintiff returned to work after her maternity leave ended, (b) that she subsequently injured her back while on duty, (c) that she filed a claim for workers' compensation in connection with that injury, and (d) that Defendant thereafter allowed Plaintiff a medical leave of absence, some or all of which was unpaid. Defendant denies the allegations contained in Paragraph 44 of the Complaint to the extent that they vary from or are inconsistent with the admissions contained in this Paragraph, and further denies any and all remaining allegations contained Paragraph 44 of the Complaint.

45.     Defendant denies the allegations contained in Paragraph 45 of the Complaint as written.

46.     Defendant denies the allegations contained in Paragraph 46 of the Complaint as written.

## CLAIMS

### COUNT I
*Sex/Pregnancy Discrimination*
**G.L. c. 151B, §§4(1, 4A and 5)**

No response is required to the allegations contained in the unnumbered paragraph that immediately precedes Paragraph 47 of the Complaint because Plaintiff has failed therein to comply with the requirement of Mass. R. Civ. P. 10(b) that "[a]ll averments of claim . . . shall be made in numbered paragraphs." To the extent that a response is required, Defendant restates and incorporates the statements contained in the preceding Paragraphs of this Answer as if fully set forth herein.

47.   Denied.

48.   Denied.

49.   Denied.

50.   Denied.

51.   Denied.

52.   Denied.

53.   Denied.

54.   Denied.

55.   Denied.

56.   Denied.

57.   Denied.

58.   Denied.

59.   Denied.

## COUNT II
### *Handicap Discrimination*
### G.L. c. 151B, §4(16)

No response is required to the allegations contained in the unnumbered paragraph that immediately precedes Paragraph 60 of the Complaint because Plaintiff has failed therein to comply with the requirement of Mass. R. Civ. P. 10(b) that "[a]ll averments of claim . . . shall be made in numbered paragraphs." To the extent that a response is required, Defendant restates and incorporates the statements contained in the preceding Paragraphs of this Answer as if fully set forth herein.

60.   Defendant is without knowledge or information sufficient to form a belief as to what period(s) of time Plaintiff means when she refers to "all relevant times," and it therefore

cannot admit or deny Plaintiff's allegations with respect to any such period(s) of time. Defendant denies any and all remaining allegations contained in Paragraph 60 of the Complaint.

61.     Defendant is without knowledge or information sufficient to form a belief as to what period(s) of time Plaintiff means when she refers to "all relevant times," and it therefore cannot admit or deny Plaintiff's allegations with respect to any such period(s) of time. Defendant denies any and all remaining allegations contained in Paragraph 61 of the Complaint.

62.     Defendant is without knowledge or information sufficient to form a belief as to what period(s) of time Plaintiff means when she refers to "all relevant times," and it therefore cannot admit or deny Plaintiff's allegations with respect to any such period(s) of time. Defendant denies any and all remaining allegations contained in Paragraph 62 of the Complaint.

63.     Denied.

64.     Denied.

65.     Denied.

66.     Denied.

67.     Denied.

68.     Denied.

69.     Denied.

70.     Denied.

71.     Denied.

72.     Denied.

73.     Denied.

74.     Denied.

75.     Denied.

## COUNT III
### Workers' Compensation Retaliation, in violation of
### G.L. 152, §75B

No response is required to the allegations contained in the unnumbered paragraph that

immediately precedes Paragraph 76 of the Complaint because Plaintiff has failed therein to

comply with the requirement of Mass. R. Civ. P. 10(b) that "[a]ll averments of claim . . . shall be

made in numbered paragraphs." To the extent that a response is required, Defendant restates and

incorporates the statements contained in the preceding Paragraphs of this Answer as if fully set

forth herein.

76.     Denied.

77.     Denied.

78.     Denied.

79.     Denied.

80.     Denied.

81.     Denied.

In response to the unnumbered "WHEREFORE" paragraph following Paragraph 81 of

the Complaint, Defendant denies that Plaintiff is entitled to the relief that she seeks, further

denies that she is entitled to any relief whatsoever, and respectfully requests that each of

Plaintiff's claims be dismissed with prejudice and that judgment be entered in favor of

Defendant, with attorneys' fees and costs awarded to the Defendant.

### AFFIRMATIVE AND OTHER DEFENSES

### First Defense

Plaintiff's claims are made by such mistake, misstatement, or omission as to render such

claims frivolous, arbitrary, and capricious, thus entitling Defendant to recover its costs,

expenses, and attorneys' fees in connection with this action.

### Second Defense

The Complaint, in whole or in part, fails to state any claims upon which relief may be granted against the Defendant.

### Third Defense

Plaintiff's claims are barred by the doctrines of waiver, estoppel, and/or laches.

### Fourth Defense

Defendant at all times acted reasonably, in good faith, for legitimate business reasons, and in accordance with its legal duties, rights, and obligations.

### Fifth Defense

Defendant had legitimate, non-discriminatory, and non-retaliatory business reasons for its actions and omissions, as well as reasonable grounds for believing that its acts and omissions were not in violation of any law, rule, or regulation.

### Sixth Defense

Plaintiff's claims are barred, in whole or in part, because any actions taken by Defendant with respect to Plaintiff were taken for legitimate, non-discriminatory, and non-retaliatory business reasons.

### Seventh Defense

Plaintiff's claims are barred, in whole or in part, to the extent that she failed to withdraw her charge from the Massachusetts Commission Against Discrimination (the "MCAD"), and/or failed to notify the MCAD of the filing of this action as required by Mass. G.L. c. 151B, § 9.

### Eighth Defense

Some or all of the claims asserted in the Complaint are barred, in whole or in part, by the applicable statute of limitations.

### Ninth Defense

Plaintiff's claims in Counts I and II of the Complaint are barred, in whole or part, to the extent that she asserts causes of action or claims for damages based on injuries compensable under the Workers' Compensation Act.

### Tenth Defense

Plaintiff's claims are barred, in whole or in part, because she is not a qualified handicapped person within the meaning of Mass. G.L. c. 151B.

### Eleventh Defense

Alternatively, and without admission of any kind, Plaintiff's claims are barred in whole or in part because Defendant did not fail to provide Plaintiff with reasonable accommodations.

### Twelfth Defense

Alternatively, and without admission of any kind, Plaintiff's claims are barred in whole or in part because Plaintiff did not suffer an adverse employment action.

### Thirteenth Defense

Alternatively, and without admission of any kind, Plaintiff's claims are barred in whole or in part because Plaintiff did not suffer an adverse employment action due in whole or in part to a disability.

### Fourteenth Defense

Plaintiff's claims are barred, in whole or in part, because she did not suffer any adverse employment action due in whole or in part to her performance of any lawfully protected act.

### Fifteenth Defense

Plaintiff's claims are barred to the extent that she requests relief which exceeds that available under applicable law.

### Sixteenth Defense

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff is seeking multiple damages, penalties, or remedies for the same conduct.

### Seventeenth Defense

Plaintiff is not entitled to some or all of the relief requested in the Complaint because, even if any unlawful practice(s) occurred, which Defendant denies, such practice(s) was/were prohibited by Defendant's policies and was/were not committed, countenanced, ratified, or approved by higher management in Defendant's corporate structure.

### Eighteenth Defense

Plaintiff has suffered no damages.

### Nineteenth Defense

Alternatively, and without admission of any kind, any damages that Plaintiff may have suffered were caused by her own conduct or by the conduct of others for whose conduct Defendant is not responsible.

### Twentieth Defense

Alternatively, and without admission of any kind, Plaintiff has failed to mitigate, or to reasonably attempt to mitigate, any damages that she may have suffered.

### Twenty-First Defense

Alternatively, and without admission of any kind, any damages that Plaintiff may have suffered were not actually or proximately caused by any act(s) or omission(s) on the part of the Defendant.

### Twenty-Second Defense

Alternatively, and without admission of any kind, any damages that Plaintiff may have suffered were caused by the acts or omissions of third parties for whose conduct Defendant is not responsible.

### Twenty-Third Defense

The damages claimed by Plaintiff are barred to the extent that they are speculative in nature.

### Reservation of Rights

Defendant Highgate Hotels, L.P. reserves the right to plead, assert, and rely upon any and all further defenses lawfully available, including those which may be disclosed or discovered through further assertions by Plaintiff or through discovery.

### JURY DEMAND

Defendant Highgate Hotels, L.P. demands a jury trial on all issues so triable.

Respectfully submitted,

**HIGHGATE HOTELS, L.P.**

By its attorneys,


/s/ Patrick M. Curran, Jr.
Patrick M. Curran, Jr. (BBO #659322)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
Telephone: (617) 994-5700
patrick.curran@ogletreedeakins.com

Dated:  December 18, 2020

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 18, 2020 a true and correct copy of the foregoing document was served by e-mail upon counsel for Plaintiff, as follows:

Lori A. Jodoin, Esq.
lori@theemploymentlawyers.com

/s/ Patrick M. Curran, Jr.
Patrick M. Curran, Jr.

45355547.1

# EXHIBIT 10

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO. 2081CV02121

SANDRA PADILLA,                    )
                                   )
          Plaintiff,               )
                                   )
v.                                 )
                                   )
HIGHGATE HOTELS, L.P. d/b/a        )
COURTYARD BY MARRIOT,              )
                                   )
          Defendant.               )

## DEFENDANT'S FIRST AMDENDED ANSWER TO PLAINTIFF'S COMPLAINT AND JURY TRIAL DEMAND

Pursuant to Mass. R. Civ. P. 8 and 15(a), Defendant Highgate Hotels, L.P. ("Defendant") hereby files this First Amended Answer and responds to the allegations in Plaintiff Sandra Padilla's Complaint and Jury Trial Demand (the "Complaint") as follows:

No response is required to the allegations contained in the unnumbered paragraph that appears on the first page of the Complaint because Plaintiff has failed therein to comply with the requirement of Mass. R. Civ. P. 10(b) that "[a]ll averments of claim . . . shall be made in numbered paragraphs," because certain of the allegations contained therein set forth legal conclusions to which no response is required, and because certain of the remaining allegations purport to restate the terms of written documents, which speak for themselves. To the extent that a response to the allegations contained in the unnumbered paragraph that appears on the first page of the Complaint is required, Defendant denies them except to the extent that they accurately characterize, represent, or set forth the contents of written documents.

## PARTIES

1.      Defendant admits only, on information and belief, that Plaintiff is a female, that she resides in East Boston, Suffolk County, Massachusetts, and that she has in the past resided in Malden, Middlesex County, Massachusetts. Defendant is without knowledge or information sufficient to form a belief as to what period(s) of time Plaintiff means when she refers to "relevant times," and it therefore cannot admit or deny Plaintiff's allegations with respect to any such time periods. Defendant denies any and all remaining allegations contained in Paragraph 1 of the Complaint.

2.      Admitted.

3.      Defendant admits only that it operates more than 100 hotels, some of which are in the United States. Defendant denies any and all remaining allegations contained in Paragraph 3 of the Complaint.

4.      Defendant is without knowledge or information sufficient to form a belief as to what period(s) of time Plaintiff means when she refers to "all relevant times," and it therefore cannot admit or deny Plaintiff's allegations with respect to any such period(s) of time. Further answering, Defendant states that at all times during the course of Plaintiff's employment with Defendant, it has employed more than 6 employees.

## ADMINISTRATIVE AND JURISDICTIONAL
## PREREQUISITES TO SUIT

5.      Defendant admits only that, on information and belief, Plaintiff filed a charge of discrimination with the Massachusetts Commission Against Discrimination on or about April 27, 2018. The remaining allegations contained in Paragraph 5 set forth legal conclusions to which no response is required; to the extent that a response to those allegations is required, Defendant denies them.

6.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6 of the Complaint.

7.    The allegations contained in Paragraph 7 of the Complaint set forth legal conclusions to which no response is required. To the extent that a response to those allegations is required, Defendant states that it does not contest the Court's jurisdiction over the subject matter of this action.

8.    Defendant admits only that Plaintiff worked for Defendant in Middlesex County, Massachusetts and that (on information and belief) she has in the past resided in Middlesex County, Massachusetts. Defendant is without knowledge or information sufficient to form a belief as to what period(s) of time Plaintiff means when she refers to "relevant times," and it therefore cannot admit or deny Plaintiff's allegations with respect to any such period(s) of time. Certain of the remaining allegations contained in Paragraph 7 set forth legal conclusions to which no response is required; to the extent that a response is required, Defendant states that it does not contest venue in this matter. Defendant denies any and all remaining allegations contained in Paragraph 8, including without limitation the allegation that Defendant committed one or more acts of discrimination that affected Plaintiff in Middlesex County.

9.    The allegations contained in Paragraph 9 set forth legal conclusions to which no response is required. To the extent that a response to those allegations is required, Defendant states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations.

## FACTS

10.    Defendant admits only that it hired Plaintiff to work at the Boston Marriott Cambridge (the "Hotel"), and that the Hotel is located in Cambridge, Middlesex County, Massachusetts. Defendant denies any and all remaining allegations contained in Paragraph 10 of

the Complaint. Further answering, Defendant states that it hired Plaintiff to work at the Hotel as

a Guest Services Agent in October 2016.

11.    Defendant is without knowledge or information sufficient to form a belief as to

what period(s) of time Plaintiff means when she refers to "all relevant times," and it therefore

cannot admit or deny Plaintiff's allegations with respect to any such period(s) of time. Further

answering, Defendant states that Ms. Padilla's job performance has been unsatisfactory during

various periods of time during the course of her employment with Defendant.

12.    Defendant is without knowledge or information sufficient to form a belief as to

what Plaintiff means when she refers to "on-the-job misconduct," and it therefore cannot admit

or deny Plaintiff's allegations with respect to such misconduct. Defendant denies any and all

remaining allegations contained in Paragraph 12 of the Complaint.

13.    Defendant admits only that, on information and belief, Ms. Padilla became

pregnant at some point in 2017. Defendant is without knowledge or information sufficient to

form a belief as to the truth of the remaining allegations contained in Paragraph 13 of the

Complaint.

14.    Defendant admits only that, to the best of its knowledge, information, and belief,

Ms. Padilla notified Defendant of her pregnancy on or about July 14, 2017. Defendant is without

knowledge or information sufficient to form a belief as to the truth of her allegations concerning

the content of her alleged conversations with Simone Elliot and Matthew Shanley, or concerning

the date(s) on which those alleged conversations occurred. Defendant denies any and all

remaining allegations contained in Paragraph 14 of the Complaint.

15.    Defendant is without knowledge or information sufficient to form a belief as to

the truth of the allegations contained in Paragraph 15 of the Complaint.

16.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 of the Complaint.

17.     Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 17 of the Complaint. The allegations contained in the second sentence of Paragraph 17 purport to characterize or restate the terms of written documents, which speak for themselves; Defendant denies those allegations to the extent that they vary, misrepresent, misstate, or improperly characterize the contents of those documents. In response to the allegations contained in the third sentence of Paragraph 17, Defendant admits only that during the period from July 2017 through September 2017, it received several written communications from medical providers concerning Ms. Padilla, and that Defendant employed Lindsey Samuels as the Hotel's Property Manager during that period. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 17.

18.     Defendant admits only that, during the course of Plaintiff's employment at the Hotel, it received several written communications from medical providers concerning Ms. Padilla. The remaining allegations contained in Paragraph 18 purport to characterize or restate the terms of written documents, which speak for themselves; Defendant denies those allegations to the extent that they vary, misrepresent, misstate, or improperly characterize the contents of those documents.

19.     Defendant admits only that, to the best of its knowledge, information, and belief, (a) Plaintiff got along reasonably well with customers, co-workers, supervisors, and upper-level managers before, during, and after her pregnancy, and (b) aside from repeated violations of Defendant's attendance policy, when she was not on leave Plaintiff generally performed her job duties adequately during her employment for Defendant. Defendant denies the allegations

contained in Paragraph 19 of the Complaint to the extent that they vary from or are inconsistent with the admissions contained in this Paragraph, and further denies any and all remaining allegations contained Paragraph 19 of the Complaint.

20.     Defendant denies the allegations contained in Paragraph 20 of the Complaint as written.

21.     Defendant admits the allegations contained in the first sentence of Paragraph 21 of the Complaint. Defendant denies any and all remaining allegations contained in Paragraph 21.

22.     Defendant denies the allegations contained in Paragraph 22 of the Complaint as written.

23.     Defendant admits only that Plaintiff requested permission to sit on a stool while working, that Plaintiff requested other accommodations, and that Defendant received written communications from medical providers concerning Ms. Padilla. Defendant denies the allegations contained in Paragraph 23 of the Complaint to the extent that they vary from or are inconsistent with the admissions contained in this Paragraph, and further denies any and all remaining allegations contained Paragraph 23 of the Complaint.

24.     Some or all of the allegations contained in Paragraph 24 purport to characterize or restate the terms of written documents, which speak for themselves; Defendant denies those allegations to the extent that they vary, misrepresent, misstate, or improperly characterize the contents of those documents. To the extent that any of the allegations contained in Paragraph 24 do not purport to characterize or restate the terms of written documents, Defendant denies them.

25.     Defendant denies the allegations contained in Paragraph 25 of the Complaint as written.

26.     Defendant denies the allegations contained in Paragraph 26 of the Complaint as written.

27.     Defendant admits only that Ms. Samuels met with Plaintiff on or about August 31, 2017. Defendant denies any and all remaining allegations contained in Paragraph 27 of the Complaint.

28.     Defendant denies the allegations contained in Paragraph 28 of the Complaint as written.

29.     Defendant denies the allegations contained in Paragraph 29 of the Complaint as written.

30.     Defendant admits only that on or about September 13, 2017, Plaintiff received a written warning for violating the Hotel's attendance policy. Defendant denies the allegations contained in Paragraph 30 of the Complaint to the extent that they vary from or are inconsistent with the admissions contained in this Paragraph, and further denies any and all remaining allegations contained Paragraph 30 of the Complaint.

31.     Defendant denies the allegations contained in Paragraph 31 of the Complaint as written.

32.     Defendant denies the allegations contained in Paragraph 32 of the Complaint as written.

33.     Defendant denies the allegations contained in Paragraph 33 of the Complaint as written.

34.     Defendant denies the allegations contained in Paragraph 34 of the Complaint as written. Further answering, Defendant states that Plaintiff first submitted documentation from a medical provider indicating that she "should be allowed the opportunity to sit down at work when she requests to do so" on or after September 27, 2020, that Plaintiff was nevertheless permitted to sit during shifts before Defendant received such documentation, and that Plaintiff was permitted to sit during her shifts after Defendant received such documentation.

35.     Defendant admits only that, during the course of his employment with Highgate, Mr. Damp sent a number of e-mails to Ms. Elliott on a variety of topics. Defendant denies the remaining allegations contained in Paragraph 35 as written. Further answering, Defendant states that Plaintiff first submitted documentation from a medical provider indicating that she "should be allowed the opportunity to sit down at work when she requests to do so" on or after September 27, 2020, that Plaintiff was nevertheless permitted to sit during shifts before Defendant received such documentation, and that Plaintiff was permitted to sit during her shifts after Defendant received such documentation.

36.     Defendant denies the allegations contained in Paragraph 36 of the Complaint as written. Further answering, Defendant states that Plaintiff first submitted documentation from a medical provider indicating that she "should be allowed the opportunity to sit down at work when she requests to do so" on or after September 27, 2020, that Plaintiff was nevertheless permitted to sit during shifts before Defendant received such documentation, and that Plaintiff was permitted to sit during her shifts after Defendant received such documentation.

37.     Defendant admits only that on or about September 26, 2017, Plaintiff left work before the end of her scheduled shift. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 37 of the Complaint.

38.     Defendant admits only that on or after September 27, 2017, it received a written communication from a medical provider (dated September 27, 2017) concerning Plaintiff. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 38 of the Complaint, and of the allegation in the second sentence of Paragraph 38 that "[t]he hospital examined her." The remaining allegations contained in Paragraph 38 purport to characterize or restate the terms of a written

document, which speaks for itself; Defendant denies those allegations to the extent that they vary, misrepresent, misstate, or improperly characterize the contents of that document.

39.     Defendant admits only that on or about October 30, 2017, Plaintiff received a final warning based on multiple violations of the Hotel's attendance policy in September 2017 and October 2017, and that in connection with that warning Plaintiff was informed that if she were to continue violating Hotel policies, rules, or regulations, she would be subject to further disciplinary action up to and including termination of employment. Defendant denies the allegations contained in Paragraph 39 of the Complaint to the extent that they vary from or are inconsistent with the admissions contained in this Paragraph, and further denies any and all remaining allegations contained Paragraph 39 of the Complaint.

40.     Defendant admits, on information and belief, the allegations contained in the first sentence of Paragraph 40 of the Complaint. Defendant denies any and all remaining allegations contained in Paragraph 40.

41.     Defendant admits only that on or about November 13, 2017, Plaintiff met with Alex Damp, Lindsay Samuels, and several other individuals, including Union shop steward Nelson Rodrigues. Defendant denies the allegations contained in Paragraph 41 of the Complaint to the extent that they vary from or are inconsistent with the admissions contained in this Paragraph, and further denies any and all remaining allegations contained Paragraph 41 of the Complaint.

42.     Defendant admits only that in late December 2017, the Hotel received a letter from Eliza J. Minsch, Esq., who stated that she had been retained by Plaintiff, and that on January 3, 2018, the Hotel (through its counsel) sent a response to Ms. Minsch's letter. Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegation that Plaintiff hired Ms. Minsch. The remaining allegations contained in Paragraph 42

purport to characterize or restate the terms of written documents, which speak for themselves; Defendant denies those allegations to the extent that they vary, misrepresent, misstate, or improperly characterize the contents of those documents.

43.    Admitted.

44.    Defendant admits only (a) that Plaintiff returned to work after her maternity leave ended, (b) that she subsequently injured her back while on duty, (c) that she filed a claim for workers' compensation in connection with that injury, and (d) that Defendant thereafter allowed Plaintiff a medical leave of absence, some or all of which was unpaid. Defendant denies the allegations contained in Paragraph 44 of the Complaint to the extent that they vary from or are inconsistent with the admissions contained in this Paragraph, and further denies any and all remaining allegations contained Paragraph 44 of the Complaint.

45.    Defendant denies the allegations contained in Paragraph 45 of the Complaint as written.

46.    Defendant denies the allegations contained in Paragraph 46 of the Complaint as written.

## CLAIMS

### COUNT I
*Sex/Pregnancy Discrimination*
**G.L. c. 151B, §§4(1, 4A and 5)**

No response is required to the allegations contained in the unnumbered paragraph that immediately precedes Paragraph 47 of the Complaint because Plaintiff has failed therein to comply with the requirement of Mass. R. Civ. P. 10(b) that "[a]ll averments of claim . . . shall be made in numbered paragraphs." To the extent that a response is required, Defendant restates and incorporates the statements contained in the preceding Paragraphs of this Answer as if fully set forth herein.

47.    Denied.

48.    Denied.

49.    Denied.

50.    Denied.

51.    Denied.

52.    Denied.

53.    Denied.

54.    Denied.

55.    Denied.

56.    Denied.

57.    Denied.

58.    Denied.

59.    Denied.

## COUNT II
### *Handicap Discrimination*
### G.L. c. 151B, §4(16)

No response is required to the allegations contained in the unnumbered paragraph that

immediately precedes Paragraph 60 of the Complaint because Plaintiff has failed therein to

comply with the requirement of Mass. R. Civ. P. 10(b) that "[a]ll averments of claim . . . shall be

made in numbered paragraphs." To the extent that a response is required, Defendant restates and

incorporates the statements contained in the preceding Paragraphs of this Answer as if fully set

forth herein.

60.    Defendant is without knowledge or information sufficient to form a belief as to

what period(s) of time Plaintiff means when she refers to "all relevant times," and it therefore

cannot admit or deny Plaintiff's allegations with respect to any such period(s) of time. Defendant denies any and all remaining allegations contained in Paragraph 60 of the Complaint.

61.     Defendant is without knowledge or information sufficient to form a belief as to what period(s) of time Plaintiff means when she refers to "all relevant times," and it therefore cannot admit or deny Plaintiff's allegations with respect to any such period(s) of time. Defendant denies any and all remaining allegations contained in Paragraph 61 of the Complaint.

62.     Defendant is without knowledge or information sufficient to form a belief as to what period(s) of time Plaintiff means when she refers to "all relevant times," and it therefore cannot admit or deny Plaintiff's allegations with respect to any such period(s) of time. Defendant denies any and all remaining allegations contained in Paragraph 62 of the Complaint.

63.     Denied.

64.     Denied.

65.     Denied.

66.     Denied.

67.     Denied.

68.     Denied.

69.     Denied.

70.     Denied.

71.     Denied.

72.     Denied.

73.     Denied.

74.     Denied.

75.     Denied.

## COUNT III
### Workers' Compensation Retaliation, in violation of
### G.L. 152, §75B

No response is required to the allegations contained in the unnumbered paragraph that

immediately precedes Paragraph 76 of the Complaint because Plaintiff has failed therein to

comply with the requirement of Mass. R. Civ. P. 10(b) that "[a]ll averments of claim . . . shall be

made in numbered paragraphs." To the extent that a response is required, Defendant restates and

incorporates the statements contained in the preceding Paragraphs of this Answer as if fully set

forth herein.

76.    Denied.

77.    Denied.

78.    Denied.

79.    Denied.

80.    Denied.

81.    Denied.

In response to the unnumbered "WHEREFORE" paragraph following Paragraph 81 of

the Complaint, Defendant denies that Plaintiff is entitled to the relief that she seeks, further

denies that she is entitled to any relief whatsoever, and respectfully requests that each of

Plaintiff's claims be dismissed with prejudice and that judgment be entered in favor of

Defendant, with attorneys' fees and costs awarded to the Defendant.

### AFFIRMATIVE AND OTHER DEFENSES

### First Defense

Plaintiff's claims are made by such mistake, misstatement, or omission as to render such

claims frivolous, arbitrary, and capricious, thus entitling Defendant to recover its costs,

expenses, and attorneys' fees in connection with this action.

## Second Defense

The Complaint, in whole or in part, fails to state any claims upon which relief may be granted against the Defendant.

## Third Defense

The Complaint must be dismissed because Plaintiff has failed to effect service of process on Defendant within the time required by Mass. R. Civ. P. 4(j).

## Fourth Defense

The Complaint must be dismissed pursuant to Mass. R. Civ. P. 12(b)(5) for insufficient service of process.

## Fifth Defense

Plaintiff's claims are barred by the doctrines of waiver, estoppel, and/or laches.

## Sixth Defense

Defendant at all times acted reasonably, in good faith, for legitimate business reasons, and in accordance with its legal duties, rights, and obligations.

## Seventh Defense

Defendant had legitimate, non-discriminatory, and non-retaliatory business reasons for its actions and omissions, as well as reasonable grounds for believing that its acts and omissions were not in violation of any law, rule, or regulation.

## Eighth Defense

Plaintiff's claims are barred, in whole or in part, because any actions taken by Defendant with respect to Plaintiff were taken for legitimate, non-discriminatory, and non-retaliatory business reasons.

**Ninth Defense**

Plaintiff's claims are barred, in whole or in part, to the extent that she failed to withdraw her charge from the Massachusetts Commission Against Discrimination (the "MCAD"), and/or failed to notify the MCAD of the filing of this action as required by Mass. G.L. c. 151B, § 9.

**Tenth Defense**

Some or all of the claims asserted in the Complaint are barred, in whole or in part, by the applicable statute of limitations.

**Eleventh Defense**

Plaintiff's claims in Counts I and II of the Complaint are barred, in whole or part, to the extent that she asserts causes of action or claims for damages based on injuries compensable under the Workers' Compensation Act.

**Twelfth Defense**

Plaintiff's claims in Count III of the Complaint are barred, in whole or in part, because they are preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.

**Thirteenth Defense**

Plaintiff's claims are barred, in whole or in part, because she is not a qualified handicapped person within the meaning of Mass. G.L. c. 151B.

**Fourteenth Defense**

Alternatively, and without admission of any kind, Plaintiff's claims are barred in whole or in part because Defendant did not fail to provide Plaintiff with reasonable accommodations.

**Fifteenth Defense**

Alternatively, and without admission of any kind, Plaintiff's claims are barred in whole or in part because Plaintiff did not suffer an adverse employment action.

### Sixteenth Defense

Alternatively, and without admission of any kind, Plaintiff's claims are barred in whole or in part because Plaintiff did not suffer an adverse employment action due in whole or in part to a disability.

### Seventeenth Defense

Plaintiff's claims are barred, in whole or in part, because she did not suffer any adverse employment action due in whole or in part to her performance of any lawfully protected act.

### Eighteenth Defense

Plaintiff's claims are barred to the extent that she requests relief which exceeds that available under applicable law.

### Nineteenth Defense

Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff is seeking multiple damages, penalties, or remedies for the same conduct.

### Twentieth Defense

Plaintiff is not entitled to some or all of the relief requested in the Complaint because, even if any unlawful practice(s) occurred, which Defendant denies, such practice(s) was/were prohibited by Defendant's policies and was/were not committed, countenanced, ratified, or approved by higher management in Defendant's corporate structure.

### Twenty-First Defense

Plaintiff has suffered no damages.

### Twenty-Second Defense

Alternatively, and without admission of any kind, any damages that Plaintiff may have suffered were caused by her own conduct or by the conduct of others for whose conduct Defendant is not responsible.

### Twenty-Third Defense

Alternatively, and without admission of any kind, Plaintiff has failed to mitigate, or to reasonably attempt to mitigate, any damages that she may have suffered.

### Twenty-Fourth Defense

Alternatively, and without admission of any kind, any damages that Plaintiff may have suffered were not actually or proximately caused by any act(s) or omission(s) on the part of the Defendant.

### Twenty-Fifth Defense

Alternatively, and without admission of any kind, any damages that Plaintiff may have suffered were caused by the acts or omissions of third parties for whose conduct Defendant is not responsible.

### Twenty-Sixth Defense

The damages claimed by Plaintiff are barred to the extent that they are speculative in nature.

### Reservation of Rights

Defendant Highgate Hotels, L.P. reserves the right to plead, assert, and rely upon any and all further defenses lawfully available, including those which may be disclosed or discovered through further assertions by Plaintiff or through discovery.

### JURY DEMAND

Defendant Highgate Hotels, L.P. demands a jury trial on all issues so triable.

Respectfully submitted,

**HIGHGATE HOTELS, L.P.**

By its attorneys,


/s/ Patrick M. Curran, Jr.
Patrick M. Curran, Jr. (BBO #659322)
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
Telephone: (617) 994-5700
patrick.curran@ogletreedeakins.com

Dated:  December 23, 2020

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2020 a true and correct copy of the foregoing document was served by e-mail upon counsel for Plaintiff, as follows:

Lori A. Jodoin, Esq.
lori@theemploymentlawyers.com

/s/ Patrick M. Curran, Jr.
Patrick M. Curran, Jr.

45403143.1



EXHIBIT 11

# Corporations Division

## Business Entity Summary

**ID Number: 001107300**       | Request certificate |   | New search |

**Summary for:  HIGHGATE HOTELS LP**

| **The exact name of the Foreign Limited Partnership (LP):** HIGHGATE HOTELS LP |
|---|

**The name used to transact business in Massachusetts:**  HIGHGATE HOTELS LIMITED PARTNERSHIP

**Entity type:** Foreign Limited Partnership (LP)

**Identification Number:** 001107300

**Date of Registration in Massachusetts:** 05-15-2013

**Last date certain:**

**Organized under the laws of: State:** DE **Country:** USA **on:** 03-12-2007

**The location of the Principal Office:**

Address: 545 E. JOHN CARPENTER FREEWAY SUITE 1400

City or town, State, Zip code, Country:  IRVING,  TX  75062  USA

**The location of the Massachusetts office, if any:**

Address:

City or town, State, Zip code, Country:

**The name and address of the Resident Agent:**

Name:    COGENCY GLOBAL INC.

Address: 45 SCHOOL STREET, SUITE 202

City or town, State, Zip code, Country:  BOSTON,  MA  02108  USA

**The name, business, and residence address of each General Partner:**

| Title | Individual name | Address |
|---|---|---|
| GENERAL PARTNER | RICKEY D. WHITWORTH | SAME SAME, TX 75062 USA 545 E. JOHN CARPENTER FWY IRVING, TX 75062 USA |
| GENERAL PARTNER | PAUL D. WOMBLE | SAME SAME, TX 75062 USA 545 E. JOHN CARPENTER FWY IRVING, TX 75062 USA |

| ☐ Consent | ☐ Confidential Data | ☐ Merger Allowed | ☐ Manufacturing |
|---|---|---|---|

**View filings for this business entity:**

ALL FILINGS
Annual Report
Articles of Amendment
Certificate of Cancellation
Certificate of Withdrawal

**View filings**

**Comments or notes associated with this business entity:**

**New search**

# EXHIBIT 12

Agreement

Between

UNITE HERE Local 26

and

Courtyard Boston Cambridge

**August 1, 2018 to January 31, 2023**

Local 26

**Boston's Local 26 Union Hall**     (617) 832 - 6699
101 Station Landing, 4th Floor
Medford, MA 02155

**Trust Fund Benefits Office**     (617) 451-0318
33 Harrison Avenue, 3rd Floor
Boston, MA 02111

**Davis Vision**               (800) 828-6102

**Regan Associates, Legal Program**   (617) 367-1100
45 School Street
Boston, MA 02108

**Modern Assistance Program**     (617) 774-0331

Courtyard Boston Cambridge

# TABLE OF CONTENTS

| ARTICLE | | PAGE |
|---|---|---|
| 43 | Alcohol & Drug Use Prevention Program | 38 |
| 42 | Banquet Department | 35 |
| 37 | Bellpersons | 31 |
| 40 | Benefit Pay Calculation | 34 |
| 25 | Bereavement Pay | 22 |
| 16 | Bulletin Boards | 17 |
| 3 | Check Off | 2 |
| 30 | Communication | 26 |
| 18 | Discipline and Discharge | 18 |
| 48 | Diversity | 43 |
| 32 | Employee Safety | 26 |
| 48 | Food & Beverage Operations | 46 |
| 38 | General Conditions | 38 |
| 20 | Grievance Procedure | 19 |
| 31 | Health and Safety | 26 |
| 4 | Hiring | 4 |
| 7 | Holidays | 8 |
| 21 | Hotel Guest Relations | 20 |
| 6 | Hours and Overtime | 6 |
| 36 | Housepersons | 31 |
| 47 | Immigration | 40 |
| 24 | Invalidity | 21 |
| 15 | Job Openings | 16 |
| 22 | Jury Duty | 21 |
| 44 | Lateral Service | 39 |
| 39 | Leave of Absence | 33 |
| 12 | Lockers and Rest Rooms | 14 |
| 19 | Management Rights | 19 |
| 11 | Meals | 14 |
| 27 | No Discrimination | 25 |
| 23 | No Strike or Lockout | 21 |
| 34 | Paid Personal Time (PPT) | 28 |
| 33 | Pregnancy Protection | 27 |
| 29 | Probationary Employees | 26 |
| 1 | Recognition | 1 |
| 5 | Report Guarantee | 5 |
| 35 | Room Attendants | 29 |
| 14 | Seniority | 15 |

Local 26

| 28 | Sexual Harassment and Workplace Violence | 25 |
|---|---|---|
| 45 | Subcontracting | 40 |
| 26 | Successor | 22 |
| 49 | Technology | 49 |
| 50 | Termination | 49 |
| 13 | Uniforms and Dress Code | 14 |
| 2 | Union Security | 2 |
| 41 | Union Stewards | 35 |
| 9 | Vacations | 9 |
| 17 | Visits by Union Representatives | 17 |
| 8 | Voter Registration | 8 |
| 9 | Wages, Benefit Funds, Pension & 401(k) | 10 |
| Appendix A | Minimum Wage Rates | 50 |
| Appendix B | Letter of Agreement | 51 |
| Appendix C | After Acquired Card Check Neutrality Procedure | 52 |
| Appendix D | Steakhouse & Sushi Bar, Restaurant & Lounge | 55 |
| Appendix E | REIT Owner Successor Letter | 56 |
| Appendix F | Non-REIT Owner Successor Letter | 60 |

# Agreement

This collective bargaining agreement ("Agreement"), effective August 1, 2018, is made by and between UNITE HERE Local 26, affiliated with UNITE HERE, and its successor and assigns (hereinafter called the "Union"), and Highgate Hotels, L.P. for the Courtyard Boston Cambridge (hereinafter referred to as the "Hotel" or "Employer").

## Article 1
## Recognition

The Union is hereby recognized as the sole collective bargaining agent for certain classifications of employees as listed hereunder.

The Union is recognized as representing regular full-time and regular part-time employees employed by the Employer at its 777 Memorial Drive, Cambridge, Massachusetts location including front desks employees, room attendants, housepersons, bellpersons, cooks, dishwashers, hosts, hostesses, cashiers, servers, lounge servers, buspersons, bartenders, maintenance personnel, and kitchen personnel, and banquet servers, but excluding office clerical employees, front office manager, executive housekeeper, bell captain, food and beverage manager, dining room manager, sales manager, banquet manager, assistant manager, night auditor, reservations manager, executive host, night chef, banquet chef, executive chef, guards and all other supervisors as defined in the Act, as amended.

The provisions of this Agreement apply to all employees for whom the Union is the bargaining agent. In the event that during the term of this Agreement additional classifications are organized by the Union and provided that they are so recognized by the Employer, or certified by the National Labor Relations Board, it is agreed that they shall become a part of this Agreement on the date of recognition or certification.

It is understood and agreed that supervisory employees are not covered by this Agreement. It is further agreed and understood that employees whose job classifications are included in the contract cannot be considered supervisory employees.

Supervisors shall not normally perform bargaining unit work, except under the restrictions which are contained in Article 44 (Lateral Service). The Hotel may have no more than one (1) chef who may be a working chef and two (2) additional kitchen supervisors who may be working supervisors, all of whom may be excluded from the unit as supervisory employees.

Working chefs and/or working kitchen supervisors shall not be scheduled in place of bargaining unit employees, nor shall they perform bargaining unit work when bargaining unit employees are not scheduled to work. There shall be no restrictions on culinary classifications assisting other culinary classifications (e.g., cold prep assisting with plating hot food) for brief periods of time to satisfy guests' and hotel's needs. This shall not result in permanent job combinations.

This Agreement, together with any amendments to which the parties agree, shall also cover all employees employed in the classifications listed above, or in classifications called by different

1

UNITE HERE Local 26

names when performing similar duties, in any hotel within the City of Cambridge, which after the effective date of and during the term of this Agreement, is owned by, operated by or substantially under the control of the Employer. The term "Employer" shall be deemed to include any person, firm, partnership, corporation, joint venture or other legal entity substantially under the control of the Employer covered by this Agreement, or one or more principal(s) of the Employer covered by this Agreement or a subsidiary of the Employer covered by this Agreement, or any person, firm, partnership, corporation, joint venture or other legal entity which substantially controls the Employer covered by this Agreement. Coverage of such an operation is conditioned upon and shall occur when the Union demonstrates that it has been authorized by a majority of the employees in the operation to represent them for the purposes of collective bargaining, but not sooner than ninety (90) calendar days after the operation officially opens to the public. The methods by which such authorizations may be obtained and majority support verified are set forth in Appendix C.

## Article 2
## Union Security

All employees covered by this Agreement who are not members of the Union shall be required to become members after thirty (30) days from the signing of this Agreement. All new employees shall become members of the Union on the 31st day of employment. New employees may sign a Union membership application before commencing work or be cleared through the Union's free employment service. The Union shall be notified weekly of all new employees hired during the previous week and all employees terminated during the previous week. All employees who become members as set forth above shall be required to maintain themselves in good standing with the Union during the life of this Agreement. Failure of an employee to remain in good standing shall be cause for his/her discharge.

## Article 3
## Check Off

A.    Dues Check-Off. Any employee who is a member of the Union may sign and furnish to the Employer an approved, revocable authorization in writing directing and authorizing the Employer to deduct his/her Union dues and Initiation Fee from his/her paycheck during each calendar week in which he/she is employed. Upon receiving such authority as described above, the Employer will deduct said dues, initiation and reinstatement fees and, after collection, the proceeds will be delivered once each month to the Financial-Secretary of the Local who is hereby designated by the Union to be the proper and authorized custodian of the said funds. The name and address of the authorized Financial-Secretary, and any changes therein, will be furnished in writing by the Union.

The Union agrees to hold the Employer harmless and to reimburse the Employer against any claims made by an employee for back pay, reinstatement or repayment of dues or initiation fees to employees arising from any action taken by the Company at the request of the Union to implement the union security and check off clauses in this Agreement.

B.   <u>Employee Reports</u>. To permit the Union to properly and efficiently carry out its responsibilities, the Employer, within the structure of the computer capabilities of the Employer's system shall provide the following information to the Union:

1.   By the tenth (10th) day of each month, a list of all employees hired into the bargaining unit during the preceding month, including each employee's name, social security number, date of birth, ethnicity, address, phone number, department, location, job title, hire date, status (full time, part time, etc.).

2.   By the tenth (10th) day of each month, a list of all bargaining unit employees terminated and the reason therefore, placed on leave of absence or transferred out of the bargaining unit, and of all employees transferred into the bargaining unit, during the preceding month including each employee's name, social security number, date of birth, ethnicity and the date(s) of such personnel transactions, and the expected date of return for leaves of absence.

3.   The reports described in subsections (a) and (b) shall deposited in an electronic format approved to by both parties.

4.   The Employer shall furnish the Union with a quarterly list of all employees in the bargaining unit, including each employee's name, social security number, department, location, job title, home address, phone number, status (full time, part time, etc.) and date of hire, date of birth and ethnicity. This report shall be deposited in an electronic format approved by both parties.

C.   <u>Monthly Dues Remittance</u>. The Employer shall remit each month to the designated financial officer of the Union, the amount of deductions made for that particular month, together with a list of employees and their social security numbers, for whom such deductions have been made. The information shall be deposited in an electronic format approved by both parties.

The remittance shall be forwarded to the above designated financial officer not later than the fifteenth (15th) of the month, for the deduction from the first paycheck prior to the fifteenth (15th) of the month received by the employee for the month the dues are being paid.

D.   <u>Voluntary Political Deductions</u>. The Employer agrees to honor voluntary political contribution deduction authorizations from its employees in the following form:

> *I hereby authorize the Employer to deduct from my pay the sum of $___ per month and to forward that amount to the UNITE HERE TIP Campaign Committee. This authorization is signed voluntarily and with the understanding that the UNITE HERE TIP Campaign Committee will use this money to make political contributions and expenditures in connection with Federal elections. I am aware of my right to refuse to sign this authorization without reprisals. This authorization may be revoked by mailing notices of revocation by United States Registered or Certified Mail, Return Receipt Requested, to the Treasurer, UNITE HERE, 275 Seventh Avenue, New York, NY 10001, and to the Employer.*

UNITE HERE Local 26

The political contribution deduction shall be made once each month during which an employee who has performed compensated service has in effect a voluntarily executed political contribution deduction authorization. The money shall be remitted within thirty (30) days after the last day of the preceding month to the *UNITE HERE TIP Campaign Committee, 275 Seventh Avenue, New York, NY 10001* accompanied by a form stating the name and Social Security number of each employee for whom a deduction has been made, and the amount deducted. A copy of said form shall be sent to UNITE HERE Local 26, 101 Station Landing, 4th Floor, Medford, MA 02155.

The Union shall indemnify, defend and save the Employer harmless against any and all claims, demands, suits or other forms of liability that shall arise out of or by reason of action taken by the Employer in reliance upon payroll deduction authorization cards submitted by to the Employer.

Nothing contained in this agreement shall be construed so as to require any employer or employee to violate any applicable law.

## Article 4
## Hiring

A.    Union Referral. Whenever new employees are required in bargaining unit classifications except as to extra banquet personnel, the Union shall be given the first opportunity to furnish such applicants, satisfactory to the requirements of the Employer. The referral by the Union of applicants for jobs shall be on a nondiscriminatory basis and shall not be based on, or in any way affected by, Union membership, bylaws, rules, regulations, constitutional provisions, or any other aspect or obligation of Union membership policies or requirements. The Employer retains the right to reject any job applicant referred by the Union.

The Employer agrees not to hire kitchen employees from employment agencies that charge the employees for placement. The Hotel shall post the provisions of this Article in places where notices to employees and applicants for employment are customarily posted.

B.    Orientation. Upon request by the Union, Union representatives shall be afforded the opportunity to meet with new hires for thirty (30) minutes during the new employee orientation session, or within the first thirty (30) days of employment if the Employer does not hold an orientation session within that time frame, without Employer representatives present. The Union shall provide advance written notice of any Union representatives designated to conduct such session. New hires participating in the session will be on paid time. The Union shall not make any disparaging comments about the Employer during such sessions.

C.    Neutrality. In the event that the Hotel becomes subject to a state or federal right to work law, the Employer agrees to remain neutral with respect to any of its employees' or prospective employees' decisions regarding membership in or support for the Union. The Employer, its supervisors, managers and other agents will not take any action or make any statement that directly or indirectly states or implies any opposition to Union membership or to the selection or maintenance of the Union as the employees' collective bargaining representative, and will not encourage or assist employees either directly or through third parties to terminate Union membership, revoke dues checkoff authorization or invoke any right to reduce financial support

4

to the Union.  The Employer will inform any employee who enquires about Union membership or support that the employee should contact the Union.

### Article 5
### Report Guarantee

Any employee covered by this Agreement who reports for work shall be given a minimum of eight (8) hours work or eight (8) hours pay, if on his/her regularly scheduled day, and a minimum of eight (8) hours work or eight (8) hours overtime pay if on an overtime day. The Employer may, however, contact the employee before 7:00 p.m. on the day before a scheduled shift to give the employee the choice of whether to work the scheduled shift. If the employee chooses to work, the Employer may assign the employee other work which the employee is reasonably capable of performing, in addition to the employee's normal duties, provided this does not cause another employee to lose a scheduled shift. If the employee chooses not to work the scheduled shift, the employee will not receive pay for the shift.

If an employee's normal workday is less than eight (8) hours, the employee will be given the number of hours of work or pay equal to the number of hours in his/her normal workday. This article shall not apply when the Employer does not request the employee to report for work but only for an interview. The provisions of this article shall not apply when the person reporting for work is under the influence of liquor or otherwise not acceptable for employment.

If an employee requests permission to leave before the completion of his/her scheduled shift and permission is granted, he/she will be paid only for the actual hours of time worked.

These report guarantee minimums will not apply under certain circumstances and modified under others. They are as follows:

1. They will not apply where the unavailability of work is due to fire, flood, power failure, "Act of God," civil disturbance, or loss of use of the property beyond the Employer's control. Under these circumstances, an employee will receive the minimum set by state law and regulations.

2. The Employer will be able to schedule food and beverage employees on a meals only basis providing a four (4) hour minimum guarantee. This scheduling shall include sufficient time allowance for room opening, closing and side work.

3. The Employer may create new turndown (housekeeping) positions within the bargaining unit warranting a four (4) hour minimum guarantee.

4. Attendance at in-house meetings will be compensated at the minimum of four (4) hours pay.

5. No split shifts will be scheduled unless requested by the employee.

If an employee does not have any hours on the posted weekly schedule, the employee may notify the Employer by Wednesday of the prior week that the employee does not want to be on the on-call list for the following week. If the employee so notifies the Employer, the employee will not be called for extra shifts that may become available in the following week and therefore will not be put in the position of refusing work that may become available. If the employee does not so notify the Employer, the employee may be called in for shifts that become available in the following week.

**Article 6**
**Hours and Overtime**

The standard workweek and workday for all regular full-time employees except those specially noted elsewhere in this Agreement shall consist of forty (40) hours, composed of five (5) eight (8) hour days worked within seven (7) days. Hours worked in excess of eight (8) hours each day or forty (40) hours in each week shall be paid for at one and one-half times (1.5x) the regular rate.

Double time (2x) the employee's regular straight time hourly rate of pay shall be paid to regular full-time employees for all hours worked on the seventh (7th) consecutive day worked, except where the seven (7) consecutive day of work is caused by a change in the employee's regular schedule. It is understood and agreed that in no event shall overtime be paid twice for the same hours under any overtime provision of this Agreement.

Open shifts shall be scheduled in the following order:

1. Employees in the same job classification where the open shift occurs who are scheduled for less than forty (40) hours by department classification seniority.

2. Employees in the same job classification where the open shift occurs who are scheduled for forty (40) hours by rotation within each work week based on department classification seniority.

3. Qualified employees from other classifications who are scheduled for less than forty (40) hours, then to qualified employees who have forty (40) hours by rotation within each work week based on Hotel seniority.

The Employer agrees to consult with the Union upon request regarding any problems in the distribution of open shifts or overtime. In the event of consistent and demonstrated abuse of the scheduling process by cancellation of shifts, failure to schedule in advance of a work week, or a failure to fill open shifts when there is a demonstrated need to do so, then the Union may move the matter directly to arbitration.

When overtime is required in circumstances when it is not feasible to utilize the process above, the Employer will seek qualified volunteers to work the overtime based on job classification seniority among the qualified employees who are working that day. If sufficient staffing is not attained, qualified employees will be selected by inverse seniority. If additional staffing is

necessary qualified employees working on the previous shift on the day in question will receive first right of refusal for working the overtime hours.

No schedule will be intentionally altered to prevent employees from receiving overtime hours.

All regular employees shall have two (2) consecutive days off except in cases of emergency.

It is the intent of the Employer to provide its employees with consistent schedules, shifts and days off in order to balance their lives outside of the workplace. Although changes in an employee's schedule may arise in meeting the needs of the business, the Employer will do what is feasible to limit these occurrences especially as they may apply to senior employees.

The Employer will provide a fixed weekly schedule of working days, shifts, and days off which schedule shall not be changed by the Employer without giving one week's notice to the employee affected. It is understood that the Employer will not change the days off frequently since the Employer recognizes the wishes of the employees to have the same days off each week as long as possible.

The Employer shall have posted in each working place a current schedule indicating hours of work and days off of each employee.

Employees will not normally be scheduled for ten (10) consecutive days of work.

Each non-gratuity employee shall be provided with the opportunity to have two (2) paid duty-free rest breaks of not less than ten (10) minutes each. Each gratuity employee shall be provided with the opportunity to have one paid duty-free rest break of not less than fifteen (15) minutes each.

The standard workday for regular full-time employees shall consist of eight (8) hours without any split in hours.

None of the foregoing provisions shall apply to banquet servers or banquet bartenders.

All employees except those required to eat while on duty shall be allotted reasonable time off for meals which shall not be considered as time worked. In compliance with Massachusetts State Law, the Employer will provide consistent lunch breaks for all employees. However, it does maintain the right to schedule lunch breaks to meet the needs of both the Hotel and its guests.

### Article 7
### Voter Registration

Two (2) times a year, the Employer will confer upon request with the Union to provide employees the opportunity to register to vote in the employee cafeteria during rest and meal breaks.

### Article 8
### Holidays

Regular full-time and regular part-time employees who have acquired seniority status and who work during the workweek of the holiday or the workweek preceding the holiday shall receive the following holidays with pay:

> New Year's Day
> Martin Luther King's Birthday
> President's Day
> Memorial Day
> July 4th
> Labor Day
> Thanksgiving
> Christmas

The requirement for work in the holiday workweek or the preceding workweek shall not apply to regular banquet employees. Eligible employees who do not work on these holidays shall be paid their respective regular day's pay; pay for part-time employees shall be on a pro rata basis in the same proportion that the employee's average regular weekly schedule bears to forty hours, computed based on the individual employee's average regular weekly work schedule during the six calendar months preceding the holiday. Employees who work on the holiday shall, in addition to the regular day's pay, be paid the regular rate for all work performed on the holidays. Employees out of work because of a leave of absence, absence due to industrial accident or layoff for lack of work of over two weeks shall not be eligible for holiday pay.

If an employee is scheduled to work on a holiday and calls out sick, he or she will forfeit their holiday pay but may receive the Paid Personal Time day benefit, if available.

If an employee calls out sick on either his/her last scheduled day of work prior to or immediately after a holiday, he or she will forfeit their holiday pay but may receive the Paid Personal Time day benefit, if available.

The Employer shall provide all bargaining unit employees with one (1) turkey before and for Thanksgiving and another on or before December 23 of each year. For the first year of this agreement the Thanksgiving and Christmas turkeys shall not weigh less than twenty (20) pounds.

### Article 9
### Vacations

The following vacation schedule shall be in effect:

| Years of Service | Weeks of Vacation |
| --- | --- |
| 1 year | 1 week |
| 2 – 5 years | 2 weeks |
| 6 – 14 years | 3 weeks |

Courtyard Boston Cambridge

| 15 - 24 years | 4 weeks |
| 25 years- 29 years | 5 weeks |
| 30 years or more | 6 weeks |

A regular full-time employee shall receive for each vacation week forty (40) hours at his/her regular hourly rate of pay. A regular part-time employee shall receive for each vacation week the average number of hours he/she worked per week during the twelve (12) months preceding the vacation at his/her regular hourly rate of pay.

A separate check will be given for each vacation week taken.

Vacations shall be scheduled and taken in increments of no less than one week at a time. Notwithstanding the foregoing, an employee may use a maximum of five (5) single vacation days in any one (1) calendar year for those employees who qualify for at least one-week of vacation.

The Employer shall fix the times or periods when such vacation may be taken between January 1st and December 31st of each year.

An employee may carry over up to one week's worth of accumulated vacation time with notice given to the Human Resources Department one month before the employee's anniversary date.

By February 15th of each contract year, Hotel management will provide a twelve (12) month blackout/grayout schedule on a departmental basis. Employees will select and notify management of their desired vacation weeks by April 1 of each contract year. The employee will provide up to three alternative dates for consideration. By May 1st of each contract year, management will provide feedback and a vacation schedule based upon these requests and business requirements. Vacations that are submitted in a timely manner will be given out by seniority. If no vacation request is submitted by an employee, he or she will have their vacations scheduled when and where feasible by seniority.

The parties recognize that the Hotel was closed for renovations from November 2006 until April 2008, and that the employees were paid an amount commensurate with their vacation prior to the renovations. Accordingly, the Employer agrees to recognize current employees who were employed by the Employer in November 2006 as meeting the "continuous service" requirement. However, the time the Hotel was closed shall not be considered as "years of service" to the Employer for vacation or other purposes, and shall not be counted or considered for any other seniority purposes.

An employee who voluntarily leaves his/her employment before the fixed time for taking his/her vacation shall not be entitled to vacation pay except after six (6) months of service with the Employer. An employee leaving the employ of the Employer shall have his/her vacation allowance computed and paid on a pro rata basis. An employee who is discharged for reasons causing financial loss to either the employer or its employees will not be considered eligible for payment of any vacation allowance.

9

UNITE HERE Local 26

In computing the vacation pay, employees who have lost more than 30 days in his/her anniversary year due to absence shall be required to make up his/her time before becoming eligible for a vacation. An employee may take his/her vacation prior to making up his/her days of absence but will not receive his/her vacation pay until he/she becomes eligible.

Employees who may be absent from work because of an industrial accident incurred in the Employer's service shall be allowed up to 60 days' vacation credit for such absence in computing days worked for vacation credit.

Employees who are on sick leave and are entitled to vacation pay shall be paid the same when their vacation period arrives.

The sale of an entire Hotel for continued Hotel operation shall not affect the vacation rights of employees as described in this Agreement, and vacations shall be paid by the successor, transferee, lessee, or assignee as though no change in ownership had occurred.

### Article 10
### Wages, Benefit Funds, Pension & 401(k)

A.    Economic Package. The bargaining parties agree to the following annual economic increases retroactive to August 1, 2018:

| 8/1/2018 | 8/1/2019 | 8/1/2020 | 8/1/2021 | Cumulative |
|----------|----------|----------|----------|------------|
| $1.50 | $1.25 | $1.25 | $1.85 | $5.85 |

The Union shall annually allocate each package increase for that year to hourly wage rate increases and benefit fund contribution increases in its sole discretion but may not allocate to any fund to which the Employer has not agreed to contribute. In the event that the Union intends to raise the wage rate of any classification by more than twenty percent (20%) over the life of this Agreement (above and beyond any across-the-board wage increases allocated from the package), the Union will meet with the Employer to negotiate such additional increase which may be implemented by mutual agreement.

Allocations to wage and benefit fund contribution increases shall occur only on August 1 of each contract year.

In addition to wage and benefit fund allocations the Union in its sole discretion may allocate money from the annual package increase to the following, provided that any increase or enhancement does not discriminate against any category of employee as set forth in Article 27:
- Bonuses
- Expansion and enhancement of health benefits
- One additional PPT days
- Benefit Pay Calculation
- Reduction of allowable bought rooms
- Banquet function rates and hourly rates
- Other items negotiated by the parties

10

Courtyard Boston Cambridge

The Union shall advise the Employer of each allocation at least sixty (60) days prior to the effective date of the allocation, provided that if the Union's notice to the Employer is less than sixty (60) days, the Employer will not be excused from paying the increases as allocated by the Union unless there is actual prejudice to the Employer by the delay and then the Employer may be excused only for a period of time equal to the length of the Union's delay in giving notice.

B.      Wages. All employees shall receive general hourly wage increases in accordance with the terms of this Article. The amount of the overall wage allocation will be divided by 0.88 to determine the non-tipped and bartender wage increase. The non-tipped wage increase will be divided by 2 to determine the tipped wage increase.

Employees shall be compensated at no less than the minimum wage rates listed in Appendix A and as those rates are increased with each yearly allocation.

Employees may be hired for a six (6) month period at 70% of the minimum wage rate and at 75% for an additional six (6) months.

Servers are the only departmental job classification that is considered tipped. All other departmental job classifications are considered non-tipped.

If there is a shortage of fifty dollars ($50.00) or more in an employee's paycheck, the Employer will correct it within forty-eight (48) hours, excluding Saturdays, Sundays and Holidays.

C.      Benefit Funds. The Employer and the Union agree to be bound by the trust agreements of the UNITE HERE Health (UHH), Greater Boston Hotel Employees Legal Services Trust Fund (Legal Fund), Greater Boston Hotel Employees Local 26 Education and Training Fund (Education Fund), and Greater Boston Hotel Employees Local 26 Housing Program (Housing Fund), or such new, merged or successor trust fund(s), as may, from time to time, be amended, and they do hereby irrevocably designate as their respective representative on the Board of Trustees, such trustees named in the trust agreement(s) as Employer and Union trustees, together with their successors, and agree to abide and be bound by all procedures established and actions taken by the trustees pursuant to the trust agreement(s). Any provision in this Agreement that is inconsistent with the trust agreement(s), or the plan of benefits, rules, or procedures established by the trustees, shall be null and void. The Employer acknowledges and agrees to comply with all fund policies, procedures and timetables regarding contributions and collection matters.

Employees, other than preferred, extra banquet servers, unless noted otherwise, shall participate in the funds listed in this Article under eligibility rules as determined by the trustees if they have applied in writing for such participation and have authorized a contribution to be deducted from weekly wages. Benefits from the above funds and eligibility for participating employees shall be determined by the trustees of the funds.

The Employer and Union shall instruct the trustees of the funds to continue to give serious consideration to the fulfillment of their legal responsibilities and fiduciary obligations in administering the funds so as to protect and not violate the interest of the funds' beneficiaries. In

11



UNITE HERE Local 26

the event that an employee owes contributions for previous weeks due to layoff, absence, payroll error or other reasons, the Employer shall deduct no more than twice the normal contribution rate per pay period until the employee's payments are current. Both the employee and the Union must agree to any other arrangement in writing.

The parties agree that the Employer will not join, promote, seek grants or financing for, partner with, or operate any health, education, housing, or legal services programs for bargaining unit members that provide the same or similar services to those provided through the UHH, Legal Fund, Education Fund, or Housing Fund without the written consent of the President of Local 26, except as otherwise identified or allowed in this Agreement.

Payments to the UHH, Legal Fund, Education Fund, and Housing Fund shall start with the first hour worked for all employees in the classifications covered by this Agreement:

1. UHH. Effective August 1, 2018, the Employer shall contribute six dollars and ninety-six cents ($6.96) per hour to the UHH to maintain the agreed-upon level of benefits and reserves for all hours for which an employee covered by this Agreement is compensated, including and without limitation, holiday and vacation hours and all FMLA hours compensated or not compensated. The Employer and the Union understand and agree that the amounts the Employer contributed to UHH during the period of August 1, 2018 through July 31, 2019 exceeded the foregoing standard and it is their intent that UHH restate the amount due for this period of time in accordance with that standard and credit the excess amounts contributed by the Employer against the Employer's contribution obligation.

   Effective August 1, 2019, the contribution shall be seven dollars and twenty-eight cents ($7.28) per hour. Effective August 1, 2020, and August 1, 2021 the Employer shall contribute the new amount per hour as determined by UHH for those contract years to maintain the agreed upon level of benefits and reserves to UHH for all hours for which an employee covered by this Agreement is compensated, including and without limitation, holiday and vacation hours and all FMLA hours compensated or not compensated.

   The increase in the Employer contribution to UHH effective August 1, 2020 shall be no greater than forty cents ($0.40) per hour. Any increase in the contribution rate above forty cents ($0.40) per hour shall be paid for out of the economic package in Section A of this Article.

   The increase in the Employer contribution to UHH effective August 1, 2021 shall be no greater than forty-five cents ($0.45) per hour. Any increase in the contribution rate above forty-five cents ($0.45) per hour shall be paid for out of the economic package in Section A of this Article.

   The Employer shall report an employee's termination or resignation to UHH on the next required work report due to UHH, but no later than thirty (30) calendar days after the termination or resignation. The bargaining parties along with UHH representatives will meet to determine options for reasonable reporting incentives and/or penalties.



12

Courtyard Boston Cambridge

2. <u>Legal Fund</u>. Effective August 1, 2018, the Employer shall contribute seventeen ($0.17) cents per hour to the Greater Boston Hotel Employees Legal Services Trust Fund for all hours for which an employee covered by this Agreement is compensated, including and without limitation, vacation and holiday hours for the maintenance of a comprehensive prepaid legal program for the use of eligible employees and their dependents. All future increases shall be made in accordance with Section A of this Article.

3. <u>Education Fund</u>. Effective August 1, 2018, the Employer shall contribute twenty-one cents ($0.21) per hour to the Greater Boston Hotel Employees Local 26 Education and Training Fund for all hours for which an employee covered by this Agreement is compensated, including and without limitation, vacation and holiday hours. Effective August 1, 2019 the contribution shall be fourteen cents ($0.14) per hour. All future increases shall be made in accordance with Section A of this Article.

4. <u>Housing Fund</u>. Effective August 1, 2018, the Employer shall contribute nine cents ($0.09) per hour to the Greater Boston Hotel Employees Local 26 Housing Program for all hours for which an employee covered by this Agreement is compensated, including and without limitation, vacation and holiday hours. Effective August 1, 2019 the contribution shall be three cents ($0.03) per hour. All future increases shall be made in accordance with Section A of this Article.

D.    <u>Pension Fund</u>. Effective August 1, 2018, the Employer shall contribute one dollar eighty-five cents ($1.85) per hour to the UNITE HERE Workers and Hospitality Employers Variable Defined Benefit Pension Fund ("Pension Fund") for all hours for which an employee covered by this Agreement is compensated, including and without limitation, vacation and holiday hours. Effective August 1, 2019, the contribution shall be increased to two dollars and sixteen cents ($2.16) per hour. All future increases shall be made in accordance with Section A of this Article.

The Employer and the Union agree to be bound by the Pension Fund Trust Agreement or such new, merged or successor pension fund, as may, from time to time, be amended, and they do hereby irrevocably designate as their respective representative on the Pension Fund Board of Trustees, such trustees named in the trust agreement as Employer and Union trustees, together with their successors, and agree to abide and be bound by all procedures established and actions taken by the trustees pursuant to the trust agreement. Any provision in this Agreement that is inconsistent with the trust agreement, or the plan of benefits, rules, or procedures established by the trustees, shall be null and void.

E.    <u>401(k) Plan</u>. The Employer shall match fifty percent (50%) of the first four (4%) percent of the employee's base pay contribution that is placed by the employee in the UNITE HERE Local 26 401(k) plan. All matching contributions will be credited to the employee's 401(k) account.

Employees enrolled in the 401(k) plan after May 1, 2009 will not be eligible for the Employer match. If an employee exits the 401(k) plan after May 1, 2009 he/she will no longer be eligible for the Employer match.



13

UNITE HERE Local 26

### Article 11
### Meals

All regular employees shall be entitled to one meal without charge for each shift worked, which shall be consumed on the premises for the convenience of the Employer. The value of such meals shall not be computed as income for tax purposes, so long as such exclusion is permitted by law.

If any employee works a split shift, i.e. eight hours within ten hours, then said employee is entitled to two meals.

Any other previous practices with respect to provision of meals or other food or drink at meal time or break time shall be continued.

### Article 12
### Lockers and Rest Rooms

Suitable lockers and sanitary rest rooms shall be provided for regular employees, and suitable protection shall be provided for the outer garments of banquet servers at no cost to them.

In the event of a general or individual inspection of lockers, there must be present a Union Steward, Chief Steward, or Union representative, or the employee whose locker is to be inspected. In the event of the employee's refusal to be present, the Employer may conduct the inspection.

### Article 13
### Uniforms and Dress Code

When the Employer requires that employees wear uniforms of identical fabric, color and style, they shall be supplied in adequate size and number and shall be cleaned by the employer. Tuxedos, black pants, black skirts, white shirts, white blouses, black shoes, black stockings, bow ties, or neckties shall not be considered to be uniforms except according to past practice.

The Employer shall not be responsible for uniforms required of steady or extra banquet servers or banquet captains. Uniforms for long-end banquet employees shall be cleaned by the Employer at regular intervals at no cost to the employee.

The Employer shall have the right to establish and from time to time to change reasonable dress codes and grooming requirements. All employees shall be permitted while on duty to wear an official Union button evidencing union membership, no larger than one and one-half (1-½) inches in diameter. The cleanliness, fit, comfort, style and safety of uniforms are important to both the employer and the employees. Additionally, the quality of linen service with respect to standards of cleanliness, reliability of delivery and accuracy of count are integral to the health and safety and productivity of employees dealing with laundered linen service. To further advance the parties' joint and respective interests on issues related to uniforms, linen and the laundering of both, upon request by the Union or the Employer, an ad hoc committee, with equal number of representatives of the Employer and the Union shall meet to consider and discuss any issues raised by either party. Both parties shall appoint their own representatives and meetings shall be conducted on paid time.

14

Courtyard Boston Cambridge

### Article 14
### Seniority

Hotel seniority shall become effective only after an employee has satisfactorily completed his/her probationary period and shall be retroactive to the date of hire. Departmental classification seniority shall begin on the employee's most recent starting date in the classification, except as provided below. Employees shall be given full seniority credit for all time worked on a regular schedule of twenty (20) hours per week or more, or as a banquet long-end employee. Employees shall be given one-half seniority credit for all time worked on a regular schedule of less than twenty (20) hours per week. A list of departments presently in use in the Hotel for departmental classification purposes has been delivered to the union simultaneous with the execution of this agreement. When the Hotel establishes a new or consolidated department, the application of seniority shall be subject to the grievance and arbitration procedure. For seniority purposes all front and service bars shall be treated as one department; cocktail servers shall be one department; and Room Service/Coffee Shop shall be one department.

Departmental classification seniority shall govern where practicable the choice of available vacation periods, choice of available days off, and choice of shifts when open. When the Employer schedules a reduction in hours, an employee scheduled less than forty (40) hours may maximize her/his schedule up to forty (40) hours by bumping a shift or shifts from an employee with less Hotel seniority who has the least departmental seniority in a classification in which the bumping employee was previously classified. The employee being bumped may not bump another employee and may not grieve her/his schedule being changed as a result of being bumped. The bumping, senior employee shall notify his/her department manager of the election to bump within four (4) days of the schedule being posted. The Employer will, where practicable, lay off employees rather than cut hours to enable as many senior employees as practicable to maintain as many hours as practicable within a straight time schedule.

Departmental classification seniority shall govern layoffs and recalls, provided the senior employee is qualified and will work the available hours scheduled and required by the Employer. An employee to be laid off shall have the following options:

1. To bump an employee with less Hotel seniority who has the least departmental seniority in a classification in a department in which the employee to be laid off has prior satisfactory experience in the Hotel. For this purpose the laid off employee shall be credited with all time previously worked in the previous classification, and shall retain such previous seniority credit after bumping back to the previous job.

2. The employee may bid on any available position, in accordance with the procedure provided by this Agreement.

3. The employee may take a layoff.

An employee bumped in accordance with the foregoing procedure shall have the same options as a laid off employee.

15



UNITE HERE Local 26

Recall shall be in reverse order of layoff for employees on lack of work status and for employees who have bumped into another job classification.

Employees shall lose their seniority on the happening of any of the following events:

1. Quitting employment.

2. Discharge for just cause.

3. In the event that a laid off employee fails to return to work within five days after notice is given or sent to the last known address on file with the Employer

4. Layoff or failure to work for a continuous period of six (6) months where an employee has less than two years of Hotel seniority.

5. Layoff or failure to work for a continuous period of twelve (12) months or more where an employee has more than two years of Hotel seniority.

6. If an employee accepts substitute employment while on a leave of absence.

7. Failure to return from a leave of absence as scheduled.

8. Working in a non-bargaining unit job with the Employer for more than six (6) months; during such six (6) month period, seniority shall be frozen but not lost.

Upon request, the Employer shall supply the Union with seniority lists and shall maintain such lists on a current basis each six months.

## Article 15
## Job Openings

The parties agree that promotions from within the bargaining unit are preferable to hiring from outside the bargaining unit, recognizing that special skills may require external hiring in certain positions. The Employer will take reasonable steps to aggressively encourage internal promotion applications. The Employer will upon request confer with the Union regarding possible steps to increase internal promotions.

Bargaining unit job openings shall be posted for at least five (5) days in locations reasonably accessible to all employees. Such postings shall include the job classification(s), contractual rate(s) of pay, and schedule(s) of hours and days to be filled.

Employees may submit written requests for such promotional opportunities within the posting period subject to the need for external hiring specified in paragraph one. The Employer will give consideration to such bids, and the senior qualified employee will be given the opening unless a junior employee is more qualified. The Employer may also determine not to fill the job.

Courtyard Boston Cambridge

If a bargaining unit member is denied a job transfer or promotion, upon his or her request, the Employer will meet with the employee to discuss how the employee can best prepare for future opportunities.

An employee transferred or promoted to another job classification and/or department in or out of the bargaining unit shall be given a trial period of up to thirty (30) days. The employee's Hotel seniority rights shall not be jeopardized by failing such a trial period. There will be no bumping under this clause. Employees successfully bidding and retained on a new job in the bargaining unit may not bid for another job until after he/she has been on the new job for at least six months, unless the Union and Employer agree otherwise in special cases.

The Employer may take such steps as are necessary to fill a job during the posting and hiring procedure above.

### Article 16
### Bulletin Boards

The Employer will provide a bulletin board for the posting of official union notices of union meetings, union elections, union recreational and social affairs and other noncontroversial matters. In the event the bulletin board has a protective glass covering a key shall be provided to the Union in order for the Union to have access to the bulletin board.

### Article 17
### Visits by Union Representatives

Authorized business representatives of the Union shall have the privilege of visiting the premises during working hours, at reasonable times, to investigate grievances or for any other Union business which may be necessary to be transacted during working hours. The Union representative shall not talk with dining room employees while meals are being served; shall not interfere with employees in the performance of their duties; and shall not engage in group or prolonged discussions in public areas. The Union representative shall not visit the guest room floors of the Hotel, but the Union Steward(s) in Housekeeping shall be made available to the representative upon reasonable request during his/her working time. No Employer representative or agent shall follow or otherwise place under surveillance any Union representative while the representative is in the establishment.

No more than two (2) authorized Union representatives, plus one interpreter, if necessary, shall be on the premises of the Hotel at any one time. The Union will notify the Employer in writing who the authorized business representatives of the Union are. A Union representative shall notify the management of his/her presence on the premises.

If the Employer feels that the provisions of this Article are being abused and no agreement is reached between the parties, the Employer shall submit this visitation article to interest arbitration in accordance with the rules of the American Arbitration Association.

17



UNITE HERE Local 26

## Article 18
## Discipline and Discharge

Employees may be discharged, suspended, or disciplined by the Employer for just cause. The parties agree that the policy of progressive discipline shall be used in all cases where warranted. Any discipline resulting in a suspension other than a *suspension pending investigation* (where termination is a consideration) or a suspension for absenteeism related issues will not be served by the suspended employee until the first step meeting set out in the grievance procedure is held.

Disciplinary records will not be made available to other employers.

Upon prior arrangement with the human resource director, an employee will be given the opportunity to inspect his/her personnel file in the human resources office during nonworking time.

If an employee so requests, a union steward or other union representative shall be present at a disciplinary interview or an investigatory interview which the employee reasonably believes might lead to disciplinary action.

No disciplinary action more than twenty-four (24) months old from the date on which the grievance was filed may be used against an employee at arbitration nor can a commendation be used for an employee's defense that is more than twenty-four (24) months old from the date the grievance was filed. However, such items can be used for impeachment purposes.

Copies of disciplinary actions will be sent to the Union.

Employees shall only be issued warning notices on the job during work time.

An employee shall not be disciplined for violation of the Employer's policy limiting the number of unscheduled PPT days which may be taken in a given time period if no more than six (6) such days are taken, if the employee calls in appropriately to report such absences. The above shall not apply to unscheduled call outs on a holiday.

## Article 19
## Management Rights

The management of the Hotel and the direction of the working force are vested solely and exclusively in the Employer and shall not in any way be abridged except as set forth in this agreement.

The Union recognizes that subject only to the express conditions of this Agreement the Employer has the right to hire, promote, transfer, layoff, discharge or discipline employees for just cause, assign work, and schedule hours, classify employees, curtail any activity or cease any operation, make and enforce the observance of reasonable rules and regulations, and maintain the efficiency of employees.

18

The determination of the type of service or products it will provide, the number of meals it will serve in its food outlets, the assignment of overtime, quality standards, hours of work, starting and quitting times and methods and procedures of operations to be used are the exclusive rights of the Employer, subject only to the express conditions of this Agreement.

The foregoing itemizations are descriptive of the general rights of management and are not to be construed as limitations thereon.

## Article 20
### Grievance Procedure

Any differences, disputes or grievances relating to the interpretation of this Agreement which arise during the term of this Agreement shall be disposed of as provided by this grievance and arbitration procedure.

No grievance shall be considered under the grievance procedure unless it specifies the nature of the grievance in writing to the Employer within thirteen (13) days after the circumstances giving rise to when the grievance first occurred or within thirteen (13) days after the date when the grievant reasonably should have known the grievance exists. Grievants shall include in the grievance the facts, the Article(s) of this agreement believed violated, and the relief sought. Each grievance submitted must bear the signature of a shop steward or other union official.

A grievance must be referred to the next step within the time frame laid out in that particular step or the grievance will be considered settled on the basis of the last answer given. The Employer shall reply in writing within the stated time periods; a failure to reply within the specified time period shall be considered to be a rejection of the grievance. If a grievance is once settled in any of the following steps, it shall be considered closed and shall not thereafter be subject to the grievance procedure or to arbitration hereunder.

*Step 1:* In the first instance the subject matter of any grievance shall be discussed between the Human Resources Director and/or the Department Head and the employee, the union steward and/or the Business Agent, who shall make every reasonable effort to adjust the grievance. The parties shall meet within fifteen (15) days from the grievance filing date. If they fail to do so any disciplinary action, including a performance suspension, may be imposed by the Employer. The matter may continue to be grieved. The Employer shall reply in writing within five (5) business days of the Step 1 meeting; or if no such meeting is held within fifteen (15) days from the date on which the grievance was filed (in which case a meeting is waived), within twenty (20) days from the date the grievance was filed. A failure to reply within the specified time period shall be considered to be a rejection of the grievance.

*Step 2:* If the parties are unable to adjust the grievance satisfactorily within five (5) business days after its submission then the matter shall be presented by the Union to the Manager or his/her designee within five (5) business days after Step 1 for discussion between management and the employee and/or a Union steward and the Union representative. The Employer shall reply in writing within five (5) business days of the second step presentation; a failure to reply within the specified time period shall be considered to be a rejection of the grievance.



19

*Step 3: Arbitration.* If no adjustment is reached within five (5) business days from the time it is submitted to the Human Resources Director or his/her designee in Step 2, the matter may be submitted within twenty (20) days thereafter to arbitration with a copy of such submission to the Employer. If the grievance is not so submitted, the matter shall be considered closed. The arbitrator shall be selected on a rotational basis from a panel of four pre-determined arbitrators, administered by the Labor Relations Connection. Each party shall submit the names of three (3) arbitrators. Upon the submission of the arbitrators' names each party shall strike one name from the other's list. The remaining arbitrators will constitute the panel of arbitrators. On an annual basis (contract anniversary) either party may terminate any panel member. Replacement arbitrators will be selected by the party whose arbitrator selection was removed in an expedited manner.

1. Sarah Kerr Garraty
2. Richard Boulanger
3. James Litton
4. John Cochran

Once an arbitrator is selected, he or she will hear the case within ninety (90) days from the date of selection. A decision must be rendered by the arbitrator within thirty (30) days after the close of the hearing which shall be extended to sixty (60) days should either party desire to file a brief. The expense for the arbitrator shall be borne jointly by the parties. The arbitrator shall be bound by the terms of this Agreement as written and shall have no right in any way to modify or revise it.

The parties agree to explore the possibility of having FMCS do a conflict resolution joint-training of shop stewards, supervisors, and managers in order to facilitate the settling of the issues in an expeditious manner.

### Article 21
### Hotel Guest Relations

Every Hotel employee will at all times show respect and courtesy for Hotel guests. This respect is shown in their communications, conduct and other actions in interacting with Hotel guests. Violations of this policy will result in either progressive discipline or if the employee's conduct is so egregious, immediate termination.

### Article 22
### Jury Duty

Each employee shall be paid their regular wages for the first (3) three days, or part thereof, while on jury duty. If an employee serves more than three (3) days on jury duty, he or she shall be paid the difference between the amount received as juror's compensation and the employee's regular straight time hourly rate, calculated only for those scheduled work days lost. If an employee is excused or released from jury service prior to the end of his or her regular work day, he or she shall promptly telephone his or her supervisor to determine whether the Hotel requires him or her to return to work. Employees must present a copy of the jury duty voucher in order to receive

Courtyard Boston Cambridge

payment. The employee is responsible to inform his or her supervisor within a week upon receipt of notice to attend jury duty.

## Article 23
## No Strike or Lockout

The Employer shall not engage in any lockout, and the Union and the employees shall not authorize, condone or engage in any strike, slowdown, picketing, cessation of work or other interference with the business of the Hotel during the life of this Agreement by reason of any dispute or disagreement, (1) between the two parties signatory hereto, (2) between either of the parties signatory hereto and a third party (except as set forth hereunder), or (3) between individuals, corporations, or unions not signatory to this Agreement.

Where the Union has been designated by the National Labor Relations Board as the bargaining agent for the employees of a leased or subcontracted operation of the Hotel which is performing work which had been performed by Hotel bargaining unit members, Section (2) in the above paragraph shall not be operable, provided that, the strike is identified as a strike against said lessee or subcontractor, the Employer has received written notice by the Union of the date of the intended strike thirty (30) days prior to the strike, and the Union is conducting a legal strike which has also been sanctioned by its International.

## Article 24
## Invalidity

In the event that any of the provisions of this Agreement may be declared invalid or illegal by operation of law, it is agreed that this Agreement shall be amended by modifying or eliminating such provisions and that all other provisions of this Agreement shall continue in full force and effect until termination of this Agreement in accordance with the terms hereof.

## Article 25
## Bereavement Pay

A regular employee shall be paid for time lost from work during up to three (3) consecutive days following the date of notice of death in connection with the death of a member of his or her immediate family (defined as: parent, step-parent, spouse, domestic partner, child, step-child, brother, sister, or grandparent). A days' pay shall be computed for regular full-time and regular part-time employees as set forth in Article 8 (Holidays). For purposes of this Article, "funeral" is understood to mean a remembrance or memorial service as well as an actual funeral, where the memorial service or remembrance is held within ninety (90) days following the death of the relative or otherwise as agreed by the parties. However, an employee shall not be allowed paid time off for both a funeral and a memorial service.



21

UNITE HERE Local 26

### Article 26
### Successor

When the Owner of the Hotel is organized in the form of a Real Estate Investment Trust ("REIT"), any and all owner obligations will be delineated in a separate "REIT Letter," which shall be in the form attached hereto as Appendix E. When the Owner of the Hotel is not organized in the form of a REIT, any and all owner obligations will be delineated in a separate "Owner Letter," which shall be in the form attached hereto as Appendix F. Such Owner will be bound solely by their respective REIT Letter or Owner Letter, as applicable, and shall not be deemed a party or bound in any way to this Agreement.

A.     In the event that the Employer voluntarily sells, transfers, or assigns all its right, title, or interest in the operation covered by this Agreement or substantially all of the assets used in such operation (or any part thereof in a permanent transaction), or in the event there is a change in the form of ownership of the Employer, the Employer shall give the Union reasonable advance notice thereof in writing, and the Employer further agrees that as a condition to any such voluntary sale, assignment, or transfer, the Employer will obtain from its successor or successors in interest a written assumption of this Agreement including a promise that the successor or successors shall retain the employees employed in each of the units represented by the Union (subject to changes in the level of staffing) and retain facially valid I-9 forms maintained by its predecessor in interest without reverifying the work authorization status of any employee for whom Employer provides to the successor a facially valid I-9 form, and furnish a copy of the written assumption agreement to the Union, in which event the assignor shall be relieved of its obligations hereunder to the extent that the assignor has fully transferred its right, title, or interest. The foregoing provisions concerning I-9 forms shall not apply where applicable law mandates the successor, without regard to any voluntary election by the successor, to require bargaining unit employees to complete new I-9 forms, and shall not prohibit the successor(s) from taking reasonable actions and/or requiring employees to take reasonable actions to correct material omissions and errors in I-9 forms received from a predecessor. Nothing in this provision shall be construed to require the Employer or any successor to employ individuals who are not authorized to work in the United States, or to prohibit the Employer or any successor from conducting an E-Verify review of I-9 forms received from a predecessor if such E-Verify review is mandated pursuant to the Employer's or successor's status as a Federal Government contractor or by other provision of law.

B.     This Section B applies when separate, unaffiliated entities own and operate the Hotel. It is recognized that the Owner of the Hotel and the Union have a common interest in protecting work opportunities for all employees covered by this Agreement. It is also recognized that the Owner needs the flexibility to select from time to time the operating entity best suited to realization of the Owner's business objectives, and that this can be accomplished without injury to the interests of the employees in the bargaining unit. Therefore, Owner shall ensure that while Owner owns the Hotel, the terms of any future operating agreement or management contract covering the Hotel shall specifically require a written assumption of the collective bargaining agreement between the Employer and the Union including a promise that the successor or successors shall retain the employees employed in each of the units represented by the Union (subject to changes in the level of staffing) and Owner shall furnish a copy thereof to the Union. Further, should Owner or a direct or indirect subsidiary of Owner sell or otherwise transfer a controlling ownership interest in all or



22

any part of the business of the Hotel (in one or a series of related stock or asset transactions), or in the event there is a change in the form of ownership of the Hotel or assets to which Owner is a party, Owner shall as a condition to such transaction obtain from the other party(ies) to the transaction who will take thereby any interest in the business or the assets used in the business a written assumption of the obligations of the Owner as set forth in this section (b), and a binding obligation that any operator it retains to operate the Hotel will assume and be bound by this Agreement. Owner will furnish a copy of the assumptions delineated in the previous sentence to the Union. Owner further agrees that, to the extent it has such documents, as a condition of any such sale, transfer, or assignment, it will transfer to the successor(s) completed Forms I-9 for all bargaining unit employees, obtain from its successor(s) a written agreement that the successor(s) will maintain these Forms I-9 in lieu of completing new Forms I-9 for bargaining unit employees ("I-9 Agreement") and furnish a copy of the I-9 Agreement (but not copies of the I-9s themselves) to the Union not less than 30 calendar days prior to the closing of the transaction. The foregoing obligation shall not apply where no such forms are required by domestic law or where applicable law mandates the successor, without regard to any voluntary election by the successor, to require bargaining unit employees to complete new I-9 forms, and shall not prohibit the successor(s) from taking reasonable actions and/or requiring employees to take reasonable actions to correct material omissions and errors in I-9 forms received from a predecessor. Nothing in this provision shall be construed to require the Employer or any successor to employ individuals who are not authorized to work in the United States, or to prohibit the Employer or any successor from conducting an E-Verify review of I-9 forms received from a predecessor if such E-Verify review is mandated pursuant to the Employer's or successor's status as a Federal Government contractor or by other provision of law.

C.      The Employer shall not divide or diminish the scope of the bargaining unit by contracting for the use of any space within the Hotel and within the control of the Employer for operations of any sort customarily performed by bargaining unit employees, including but not limited to food and beverage outlets; any such contracting may be done by the Employer only in accordance with the terms of this Agreement, including those concerning subcontracting, and this provision does not alter or reduce in any extent the Employer's rights under such provisions. Nothing in this subsection shall preclude an owner or any other party in interest from contracting for the use of space that is not controlled or managed by the Employer as an existing part of the hotel operation, or preclude the continued leasing or future leasing, whether to the current or any other lessee, of any space currently leased in the Hotel, or preclude the leasing of space currently controlled by the Employer to a different third party subject to the provisions of part (b) in the following sentence. The Owner shall not require the Employer to relinquish any part of the Hotel premises managed by the Employer except for (a) use in operations that would not be covered by this Agreement if they were conducted by the Employer or (b) use in operations that would be covered by this Agreement provided that the economic package paid to or on behalf of employees performing work covered by this Agreement shall not be less than the economic package paid to or on behalf of employees under this Agreement and shall include an employer-paid defined benefit pension plan. The economic package shall include all emoluments of employment having definite and quantifiable economic value, including but not limited to wages (including premiums, bonuses and incentives, guaranteed workdays or workweeks, health and hospitalization benefits, retirement plan participation, paid vacation, paid holidays and paid sick leave). Nothing in this



UNITE HERE Local 26

section or this Agreement generally is intended to expand or otherwise add to the existing bargaining unit.

D.      If ownership of the Hotel is transferred in an involuntary transaction, the Employer shall deliver to the Union copies of the entire contents of the personnel files (excluding attorney-client privileged documents, investigatory materials and medical records) of all bargaining unit employees except those files which are delivered to the transferee because it has employed or has made a legally-binding commitment to employ the employees to whom the files pertain.

E.      The provisions of this Agreement prohibiting strikes shall be suspended upon the initiation of any proceeding to authorize the sale of the Hotel in an action filed under Chapters 7 or 11 of the United States Bankruptcy Code with respect to the Hotel or with respect to a business segment that includes the Hotel, or by delivery to the Employer of a notice of sale in foreclosure or other similar notice that the Hotel will be taken in a transaction that is not voluntary by the Employer, except where prohibited by domestic law, and shall remain suspended unless and until the condition that caused the suspension has been resolved completely or the Union delivers a written waiver of the suspension. The Employer shall deliver written notice to the Union of a filing or notice covered by this subsection within five days after the Employer files or receives the petition or notice, and shall include a copy of the petition or notice. Notwithstanding any provisions of this section (E) to the contrary, the provisions of this Agreement prohibiting strikes shall remain in full force and effect if (a) in the case of the initiation of any proceeding to authorize the sale of the hotel in an action filed under the applicable bankruptcy laws, the assumption of the obligations of the owner under this Agreement (as defined hereinafter) is made an express condition of such sale, or (b) in the case of a notice of sale in foreclosure or similar notice that the Hotel will be taken in a transaction that is not voluntary by the Employer, the lender or other entity causing the issuance of the notice has agreed in writing in an instrument making the Union an express third party beneficiary of the promise, that if it retains ownership of the Hotel, to assume the obligations of the Owner under this Agreement (as defined hereinafter), or if the Hotel is sold or transferred, that it will require as a condition for such sale or transfer, that any purchaser or transferee to assume the obligations of the Owner under this Agreement (as defined hereinafter). For purposes of this section (E), the "obligations of the Owner" shall include (i) the obligation of the purchaser or transferee (the "New Owner") to assume this Agreement and to retain the then-current bargaining unit employees, both of which as and to the extent required by section (A) above, or (ii) if the New Owner is not the operator of the Hotel, either directly or through a wholly owned or controlled affiliate, the obligation not to hire a replacement managing entity unless that entity agrees to assume this Agreement and to retain the then-current bargaining unit employees, both of which as and to the extent required by section (B) above.

F.      The Union shall not be required to post a bond or other security as a condition to obtaining an injunction or other equitable relief against a violation or threatened violation of this Article.

G.      The obligations of this Article shall expire one (1) year following the expiration of this Agreement. During this one (1) year period, the obligations of this Article shall be enforced through the procedures for arbitration provided elsewhere in this Agreement and the Union shall retain the power to seek injunctive relief through judicial action as provided in this section.



No owner, REIT or otherwise, shall be deemed to be the Employer or a joint employer party to this Agreement, solely by virtue of sections (B) through (G) above.

## Article 27
## No Discrimination

The Employer and the Union agree that there shall be no discrimination as to wages, hours or working conditions against any employee on account of race, color, creed, national origin, disability, religion, veteran status, sex, sexual orientation, union status or activity, age or any protected status as provided by law.

Any references including job classification to one gender shall be deemed to include the opposite gender.

## Article 28
## Sexual Harassment and Workplace Violence

Harassment and workplace violence will not be tolerated. Individuals engaging in such conduct will be subject to discipline including immediate discharge. Harassment for the purposes of this article includes, but is not limited to, abusive or threatening language, conduct creating a hostile work environment, workplace violence and sexual harassment. Sexual harassment is also considered a form of sex discrimination. No employee shall be subjected to sexual harassment in the workplace. This shall include sexual harassment because of a person's sexual orientation.

In this spirit a statement of policy and commitment to this principle will prevail in all work areas. The Employer agrees to give priority consideration to any grievance involving sexual harassment. The parties also agree that the Hotel will take reasonable steps to eliminate sexual harassment, whether from supervisors, employees, or customers, including scheduling once each year, in December or earlier, for all employees and supervisors, of an awareness program regarding the problem of sexual harassment. Upon request, the Employer will confer with the Union regarding the contents and scheduling of such programs.

## Article 29
## Probationary Employees

The Employer, during the employee's probationary period, may discipline or discharge said employee at the Employer's sole and exclusive discretion, and neither the Union nor the probationary employee shall have recourse to the grievance or arbitration procedure for any act of discipline or discharge during the probationary period. For all employees the probationary period shall be sixty (60) calendar days of continuous employment at the Hotel.

## Article 30
## Communication

House rules and job postings shall be provided in such languages, up to the four (4) major languages, as are necessary to communicate effectively in the Hotel.



### Article 31
### Health and Safety

The Employer recognizes its obligation to provide a safe and healthy working environment for each employee. The Union agrees that each employee is obligated to obey reasonable rules related to health and safety.

The Employer agrees to give priority consideration to any grievance involving health and safety.

The Employer shall maintain defibrillators on property. The Union and the Employer will confer annually on the proper maintenance, inspection, and training of employees on the use of defibrillators. The parties agree that the Hotel must notify the Union in writing within thirty (30) days of the Employer's intent to no longer have defibrillators located on property.

### Article 32
### Employee Safety

A.    Panic Button System. The Employer shall provide a safety alarm to each employee assigned to work in a guest room without other employees present, at no cost to the employee. Each employee shall be required to carry the device with him or her at all times when working and to utilize such device when he or she believes there is an ongoing crime, harassment, or other emergency in the employee's presence. The devices shall be able to summon immediate on scene assistance to their location from another employee or security guard. The purpose of this section is to protect employee safety. The device may not be used to track or discipline for productivity-related issues. The employee in danger may cease work and leave the immediate area where the incident occurred to await the arrival of the employee or security personnel responsible for providing immediate assistance. Such systems shall be installed in the Hotel no later than June 30, 2020.

B.    Handling of Complaints. The Employer shall record an accusation that a guest has made an unwanted sexual advance, request for sexual conduct, or other verbal or physical conduct of a sexual nature towards an employee or towards another guest of the establishment, including the name of the guest. The Employer shall inquire for the name of the guest if that information is not included in the initial notice to the Employer. If the Employer is unable to learn the name of the guest, the Employer shall learn and record as much identifying information about the guest as is reasonably possible. The Employer shall maintain a list of all guests so accused for at least five (5) years from the date of the most recent accusation against the guest. Guest as used throughout this section means registered guest, others occupying guest rooms with registered guests, and visitors invited to guest rooms by a registered guest or other occupant of a guest room. Upon request, the Employer shall reassign the employee to a different floor or work area away from the guest for the entire duration of the guest's stay.

If the Employer learns that any guest on the list is staying at the Hotel, the Employer shall notify the Union and any housekeeper, room server or any other employees assigned to work in this guest's room of the same prior to the start of their scheduled shift, and shall warn the employees



to exercise caution when entering that designated room during the time the guest is staying at the Hotel. The Employer reserves the right to assign a non-bargaining unit employee to service the room.

C.      Contacting Law Enforcement. Upon receipt of an allegation of sexual assault or other criminal conduct by a guest against an employee, the Employer shall promptly contact local law enforcement with jurisdiction, immediately notify the employee that law enforcement has been contacted, that he or she may be asked to provide a statement, and that they have a right to decline to do so, and provide the employee with sufficient paid time to provide a police statement, and shall fully cooperate with any investigation into the incident undertaken by the agency.

D.      Banning of Guest. When an allegation of sexual assault or criminal conduct by a guest against an employee is supported by a police report and statement made by such employee under penalty of perjury, the Employer shall inform the guest that he or she is prohibited from returning to the Hotel, and shall maintain such prohibition for at least three (3) years from the date of the incident alleged in the statement.

E.      No Retaliation. There shall be no retaliation against any employee for seeking to enforce his or her rights under this section by any lawful means or for otherwise asserting rights under this section.

### Article 33
### Pregnancy Protection

If an employee so requests, and consistent with both the employee and employer's obligations under applicable law, the Employer shall provide a reasonable accommodation related to such employee's pregnancy, childbirth, or related conditions, including but not limited to the need to express milk for a nursing child. "Reasonable accommodation" may include, but not be limited to, more frequent or longer breaks, time off to recover from childbirth, temporary transfer to a less strenuous or less hazardous position, job restructuring, light duty, additional break time, reduction in room assignments, private non-bathroom space to express breast milk, assistance with manual labor and modified work schedules. Any time off provided as a reasonable accommodation will run concurrently with any protected leave the employee is otherwise entitled to take for the condition under applicable law.

### Article 34
### Paid Personal Time (PPT)

A.      PPT Accrual. Each employee who has one (1) years' service or more as of December 1 of each year shall be allowed up to 48 hours of Paid Personal Time (PPT) per benefit year. All other employees with less than twelve (12) months of employment will begin to accrue one (1) hour of PPT for every thirty (30) hours worked, capped at forty (40) hours of PPT during the benefit year and in accordance with M.G.L. c. 149, § 148C and associated rules and regulations. This accrual system shall apply to employees who have less than twelve (12) months of employment on December 1 of each successive year. Employees may use PPT time after ninety (90) days of

27



employment. PPT is intended to constitute sick time under M.G.L. c. 149, § 148C, and the Employer shall not be obligated to provide paid sick time beyond what is provided in this article.

B.   PPT Accumulation and Cash Out. Accumulation from year to year will be permitted. Any employee may cash out unused accumulated PPT hours above eighty (80) and no more than one hundred sixty (160) from the Hotel at fifty percent (50%) of the hour's value. Any employee may cash out unused accumulated PPT hours above one hundred sixty (160) from the Hotel at one hundred percent (100%) of an hour's value.

C.   PPT Not Used as Paid Sick Leave. PPT should be scheduled and planned whenever possible, provided that PPT used as paid sick leave, as set forth in the Earned Sick Time law, G.L.c. 149, s. 148C, and any regulations enacted thereunder shall be used subject to (D) and (E) below. Employees may request to use PPT(s) up to twenty-four (24) hours before the posting of the schedule. The Employer should respond immediately to all requests for PPT requested twenty-four (24) hours before the posting of the schedule. For requests made in advance of twenty-four (24) hours, the Employer shall respond within two (2) days. Requests for PPT are granted on a first-come, first-serve basis. If two (2) or more employees on the same day request the same day off, seniority shall govern which of the employee(s) receives the day-off, if business needs do not allow all requests to be granted. The Employer will not unreasonably deny PPT requests.

D.   PPT Used as Paid Sick Leave. In the event an employee uses accrued PPT as paid sick leave (including leave to care for and attend appointments related to the physical or mental illness, injury, or health condition of the employee or that of a family member, to attend routine medical appointments of the employee or that of a family member, to travel to and from a pharmacy or other location required in the course of the aforementioned care, and to address psychological, physical or legal effects of domestic violence), then the leave shall comply with the minimum requirements of M.G.L. chapter 149, section 148C, including, but not limited to:

1. PPT may be used in hourly increments;

2. If the need for paid sick leave is foreseeable, an employee must provide advance notice to his or her supervisor;

3. If the need is unforeseeable, an employee must utilize the standard call-in procedures, if practicable;

4. In the case of emergency, an employee should notify his or her direct supervisor, as soon as practicable;

5. When permissible, an employee may be required to provide documentation regarding an absence, including when an employee is out of work on paid sick leave for more than twenty-four (24) consecutively scheduled hours, the employee can be required to provide supporting documentation from a health care provider; and

6. An employee who requests or uses paid sick leave for authorized circumstances or makes a complaint about a suspected violation of this policy shall not be subject to discrimination or retaliation.

E.   Definitions. For purposes of this Article, the following terms shall have the following definitions:

1.   "Child" means a biological, adopted or foster child, stepchild or legal ward, or a child for whom the employee has assumed the responsibilities of parenthood;

2.   "Family member" means the employee's spouse, child, or parent, as defined; and

3.   "Parent" means a biological, adoptive, foster, or step-parent of an employee or of an employee's spouse, or the person who assumed the responsibilities of parenthood when the employee or employee's spouse was a child.

### Article 35
### Room Attendants

A.   Maximum Rooms. No room attendant shall be required to do more than fourteen (14) rooms without additional compensation equal to one-half the employee's regular straight time hourly rate of pay per room for each room over fourteen (14) within the eight (8) hour day. When a room attendant does more than fourteen (14) rooms within his/her normal day, he/she will be paid such extra payment for each such extra room and shall receive no other payment for the time required to do such extra rooms. For work performed after eight (8) hours, the sole payment shall be at the rate of time and one-half (1.5x) the employee's regular straight time hourly rate of pay. Extra rooms will be distributed equitably. The Employer agrees to consult with the Union upon request regarding any problems in extra room distribution.

The Employer will call room attendants to work before selling any extra rooms.

B.   Reduction in Quota. The present contractual room quota shall be reduced by one (1) room on a day when there are ten (10) check out rooms, by two (2) rooms when there are eleven (11) checkout rooms, and by three (3) rooms when there are twelve (12) checkout rooms in the room attendant's assignment.

C.   Completion of Assignments. The room attendant will accept all reasonable assignments of extra rooms given out on his/her shift whether or not such assignments would require the employee to work beyond an eight (8) hour shift. Appropriate compensation including overtime where applicable will be paid for the extra room(s) assigned. Room Attendants will be paid weekly for all extra rooms done.

D.   Special Attention Rooms. Rooms requiring special attention and which will be held to a higher cleaning standard shall be identified by a special code on the room attendant's assignment sheet. One (1) room shall be dropped for any room so designated. Additionally, inspectresses, supervisors, and management shall not hold room attendants to a higher standard of cleaning for rooms not specially designated. The Employer may continue to designate rooms as VIP rooms but not require a higher cleaning standard for such rooms. "VIP" rooms shall not be identified on a room attendant's daily assignment unless it requires special attention, in which case it will be



designated a special attention room by the Hotel's special attention code and a room will be dropped from the daily assignment. The order of rooms to be cleaned may be designated by the notation "priority." VIP rooms may be so identified on the work sheets of quality assurance associates.

E.     Suites. For purposes of the above room quota, all rooms in a suite with more than one room shall count toward the quota, i.e., a two (2) room suite shall count as two (2) rooms, a three (3) room suite as three (3) rooms, etc.

F.     Night Room Attendant. The regular full-time night room attendants' workday shall be eight (8) hours including meal periods with time and one half (1.5x) for all time worked in excess of eight (8) hours in one night.

G.     Sundays and Holidays. Room attendants shall be permitted to report one (1) hour later on Sundays or holidays, or to leave one (1) hour earlier, without affecting their wages for the day, provided they complete their normal days' work.

H.     Changing Time. Room attendants shall be allowed to leave their sections ten (10) minutes before quitting time to allow for changing to street clothes.

I.     Miscellaneous. When room attendants are required to dust three (3) vacant rooms, they may be required to make up one (1) room to compensate. They may be required to make up one (1) room for two (2) sleep-outs.

J.     Travel and Sections. Room Attendants shall not have to work on more than one (1) floor, but if required to work on two (2) or more floors, there shall be a maximum of thirteen (13) rooms to a section.

To the extent reasonably possible, considering occupancy and other factors, room attendants shall be assigned to permanent floors or sections. When a vacancy exists in a floor or section assignment, seniority shall be given consideration.

K.     Linen. Sufficient linen, equipment, and cleaning materials will be provided to all room attendants. The Employer shall make reasonable efforts to provide sufficient linen to room attendant's on their respective floors.

L.     Special Cleaning. Any employee cleaning a room requiring special cleaning for vomit or defecation shall be paid $25.00 additional for cleaning such room.

M.     Cots. Room Attendants shall be paid $1.95 cents for each cot made up. Effective January 1, 2019 the payment shall be $2.27; January 1, 2020 the payment shall be $2.63; January 1, 2021 the payment shall be $3.00.

Three (3) cots shall equal one (1) room. Pull out beds shall be counted as cots for purposes of this paragraph when they are not the primary bed(s) in that room.



N.     Gratuities. The Employer and the Union agree that gratuities left by guests in Hotel rooms are for the exclusive benefit of room attendants. No one shall be permitted to remove a gratuity from a guest room other than the room attendant who cleaned that room.

### Article 36
### Housekeeping Housepersons

The parties agree that housepersons are important and necessary to the efficient operation of the Housekeeping Department. The Employer agrees to consult with the Union upon request concerning any problems of housepersons.

Housepersons will receive the same compensation under the same circumstances that a Room Attendant is compensated for making up a cot.

### Article 37
### Bellpersons

Bellpersons, baggage porters, and doorpersons shall not be assigned the duties of housepersons, yardpersons or lobby porters, except that this clause shall not be construed to eliminate the present duties performed by them.

Whenever a bellperson relieves on the elevators for a period of one hour or more, he/she is to be paid the elevator rate of pay in addition to his/her regular pay. It is understood that the junior bellperson is to be assigned the elevator duty, everything else being equal.

When bellpersons are required to make up cots, they shall be paid $1.80 for each cot made up.

Three dollars and twenty-five cents ($3.25) per bag shall be paid for tours, canceled airline flights, school, and athletic groups, where bellpersons are required to place baggage in rooms.

Fronts shall be rotated. Bellpersons performing house errands shall have an opportunity to make up all fronts lost.

### Article 38
### General Conditions

A.     Hourly Rates. No employee shall suffer a reduction in his/her hourly rate as a result of this Agreement, and this Agreement shall not interfere with the employees receiving higher wages or compensation for superior knowledge and ability, nor shall this Agreement serve to deprive these employees of any privileges enjoyed before this Agreement was made.

B.     Payment of Wages to Extra/Relief Employees. All extra and relief jobs done by an employee not on the regular payroll shall be paid at the termination of the job unless otherwise agreed upon.

C.     Higher/Lower Wage Rate Classifications. Whenever an employee substitutes for another employee in a higher classification, said employee shall be paid at the minimum rate for such higher classification, and the employee shall not raise any jurisdictional or other like objections to such change of duties. When transferred temporarily to a lower paid classification for the convenience of the Employer, the employee shall continue to receive his/her regular rate of pay. Such transfers shall be subject to Article 14 (Seniority).

D.     Workload. The Union may grieve and arbitrate unreasonable workloads.

E.     Guest Checks. The fact that a gratuity is not included shall be announced to the guest on all checks except in gourmet rooms. Gratuity calculations shall be printed at the bottom of each check for 15%, 18% and 20%. This provision shall be made effective in each room when a new supply of checks is next ordered for that room after the signing of this Agreement. There shall be an automatic gratuity of 18% added to all checks for parties of six (6) or more.

F.     Turn Sheets. A turn sheet shall be kept for room service orders except where room service employees are assigned by floors. Turns shall be rotated to the extent practicable.

A turn sheet shall be kept in each room for servers. Turns shall be rotated to the extent practicable.

G.     Lost and Found. Items, excluding food and beverage, turned into lost and found shall be tagged with the name of the employee turning in the item and the date turned in. Such items shall be kept in a secure location, and if unclaimed after twelve (12) months, shall be given to the employee turning them in, in accordance with Massachusetts General Laws, Chapter 134, Section 4. If such items are claimed, the Employer shall keep a record, available to the Union upon request, of the name of the person claiming the item.

H.     Package Passes. Packaged food and perishable items (e.g., flowers/floral arrangements) given to Hotel employees as a gratuity may be claimed by securing a package pass on the item(s). If an employee takes the above-gratuity out of the Hotel without a package pass the individual circumstances will be reviewed on a case by case basis before subjecting the individual to discipline. The removal of unopened stamped or unstamped alcohol gratuities will be governed by the licensing laws of the City of Cambridge.

I.     Kickbacks. No employee shall be required to contribute to another employee or to the employer ("kickbacks"). This shall not preclude the voluntary practice of some employees tipping other employees, e.g., servers tipping buspersons, or the voluntary pooling of tips among tip employees such as captains, servers and buspersons.

J.     Bartenders and Long-End Employees. The Employer agrees that bartenders and long end (steady) banquet servers deriving their sole income as bartenders and as long end (steady) banquet servers shall receive priority in hiring and assignments over bartenders who are engaged in full-time work other than as bartenders, and over servers other than long end (steady) banquet servers, provided they are at least equally qualified to do the work.

K.     Pre-tax Deductions. Unless the employee makes a written request to the contrary, an employee's contributions for health and welfare premiums and 401K payments and MBTA passes will be deducted from his/her weekly wages prior to deduction of state, federal and FICA taxes.

**Article 39**
**Leave of Absence**

A.     Employer Permission. Permission for leaves of absence shall not be unreasonably denied, bearing in mind the needs of the business.

B.     Return to Work. An employee who receives a written leave of absence from the Employer shall be entitled to all seniority rights upon his or her return to work, which shall be to his/her prior position, provided that he/she returns to work prior to the expiration of the leave of absence, and provided also that he/she has not accepted substitute employment elsewhere during the leave of absence. The leave may be for up to three (3) months. In returning from leave, an employee must notify Hotel management of his/her intent to return to work a minimum of one (1) week prior to his/her anticipated date of return to work.

C.     Health Care Provider Certification. The Employer may require certification from the employee's physician as to the employee's inability to work prior to granting medical leave of absence for any disability including pregnancy-related disabilities, and doctor's certification of ability to work prior to return from a medical leave of absence.

D.     Extended Leaves. The employee may apply for an extension. Upon return to work from an extended leave of absence the employee shall be returned to his/her former position, without loss of prior seniority.

E.     Paid Maternity/Parental Leave. Employees with one (1) or more years of service will be eligible for:
   - Six (6) weeks of paid maternity leave, if an employee gives birth, to commence immediately following the birth of the child; and
   - Two (2) weeks of paid parental leave, if an employee's spouse gives birth, to commence within sixty (60) days of the birth of the child.

F.     Family Medical Leave. The parties agree to comply with all provisions of the Family and Medical Leave Act and any amendments to the same. Employees are eligible for leave under the FMLA if they have worked at least 1,250 hours during the twelve (12) months prior to the requested leave of absence. An Employer may require an employee to use fifty percent (50%) of their accrued PPT and/or vacation time on a FMLA leave. The remaining fifty percent (50%) of accrued PPT and/or vacation time may be used, at the sole discretion of the employee in accordance with regular scheduling policies.

G.     Union Leave of Absence. In the event an employee is appointed to any office or position within the Union they shall be given a leave without pay upon proper notification to the Employer. Proper notification shall be two (2) weeks prior to the beginning of the leave. Such leave shall not constitute a break in seniority and will be for a maximum of one (1) year, a minimum of one (1)

workweek and shall be taken as full week leaves or multiples thereof. The parties agree the Union can appoint up to four (4) employees, and not more than one (1) per department at any one time, and an employee cannot be granted Union leave more than three (3) times in one (1) calendar year.

H.      USERRA Leave of Absence. The Employer shall comply with the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), as amended. Any employee covered by USERRA shall be entitled to seek enforcement of asserted USERRA rights through the grievance and arbitration procedures in Article 20 of this Agreement, provided that the employee may be required by the Employer to waive any right of court enforcement as a condition to proceeding to arbitration on the employee's USERRA claims.

Further, the Employer shall continue to make contributions into the health and welfare, education, legal, and housing trust funds during the first year of military service on behalf of any employee who volunteers for military service or is called up to military service because the employee is either in the National Guard or is a Reservist. Such contributions shall be at the minimum level of contributions for coverage required by the Plan.

Upon completion of their military service and upon their return to work, the Employer shall, as provided in applicable regulations make retroactive pension contributions, if any on behalf of the above referenced employees for the entire period that the employee was on leave for military service.

### Article 40
### Benefit Payment Calculation

Pay for vacation, holiday, sick pay, jury duty and funeral leave for servers, bellpersons, baggage porters, bell captains, and doorpersons shall be calculated at one and one half (1-½) times the employee's regular straight-time hourly rate of pay. Effective August 1, 2019, such employees shall be paid for vacation, holiday, PPT, jury duty and funeral leave at the same hourly rate as a room attendant.

The Employer agrees to discuss with the Union upon request regarding the administration of any regulations issued by the Internal Revenue Service related to the reporting of gratuities as income, so long as the law is observed.

### Article 41
### Union Stewards

The Union may designate one (1) union steward for every thirty (30) bargaining unit members within the Hotel. The Union shall notify the Employer in writing of the identity of the Union stewards and chief steward.

The Employer shall recognize such stewards and treat them with the respect due them as representatives of the employees. Union stewards including the chief steward shall have super-seniority for purposes of layoff and recall in each steward's departmental classification.



## Article 42
## Banquet Department

A.  Long-End Servers. Long-end (steady) banquet servers, bartenders, coffee servers, and barpersons (barbacks) shall be recognized as regular employees and afforded all of the rights and benefits of a regular employee under this Agreement.

Long-end employees shall be given 48 hours of notice of their schedules except for reasons of emergency, customer needs or for other reasons beyond the reasonable control of the Hotel.

Employees from the Preferred List shall be considered for long-end positions before external candidates from outside the Hotel.

B.  Trust Fund Contributions. The Employer will contribute to the UHH, Legal Fund, Education Fund, and Housing Fund for long-end employees at the specified rate for one hundred twenty (120) hours per month for twelve (12) month per year. They will be accorded full participation in these programs subject to the eligibility and payroll deductions for employee contributions as are required of all participating employees.

The Employer will contribute to the Pension Plan for long-end employees at the specified rate for one hundred thirty-five (135) hours per month for twelve (12) months per year.

C.  Extras. In addition to the service charge set forth below, banquet employees shall receive the following function rate compensation:

| | |
|---|---|
| Extra bartender daily rate with meals | $52.50 |
| Banquet servers and extra banquet servers & tuxedo, breakfast and luncheon (3 hours or less for one meal) | $19.05 |
| Banquet servers serving more than 15 persons for breakfast and luncheon shall receive for each additional person served | $1.21 |
| Dinner 3 hours or less for one meal | $20.05 |
| Banquet persons serving more than ten Persons for dinner banquets shall receive for each additional person served | $1.91 |

D.  Coffee Breaks and Receptions. Coffee jobs and receptions shall be paid for at the rate of the function occurring at the time of day. For receptions combined with or immediately followed by the meal, only one meal payment will be paid plus extra hours if applicable, except that past practices on payments of such receptions at the Hotel shall be followed. Banquet servers shall normally serve a minimum of fifty (50) guests at a reception.

35



E.    Published Menu Price. A "published menu" is defined as a menu that is offered by the Employer to the general public at the same price. Published menus and the prices they are offered may change from time to time, at the sole discretion of the Employer.

F.    Discounted Banquet Pricing. The Employer at its sole discretion may offer clients a discount from the published menu price. However, the banquet service charge shall be paid on the full menu price.

G.    In-House Functions. The service charge for in-house functions is ten percent (10%) of the published menu price. When no published menu price exists, the price for the item(s) will be set by the Employer based on the published menu price of comparable menu item(s).

H.    Longer Functions. Banquet servers shall receive $9.20 per hour of time required of them beyond the function hours to continue service, break down, and for standby time spent between the completion of service and the breakdown. This shall apply only to those servers, if any, as are designated by the hotel to stand by, continue service, and break down, provided they spend such time on the hotel premises.

I.    Minimum Gratuity. A minimum tip of fifteen percent (15%) will be added to the food and beverage charge for functions of employees in the bargaining unit who work a function. A minimum fifteen percent (15%) tip on liquor will be shared by the bartender and barperson:

      Bartender  12.75%
      Barperson  2.25%

Upon request, the Employer shall furnish to the Union a breakdown of the distribution of the tip. The Union may also upon request examine the banquet check.

Regular luncheon menu or dinner menu buffets will be paid for at the lunch or dinner rate and shall be prorated for each cover over thirty (30) covers.

Continental breakfasts shall be paid for at the buffet rate.

J.    Outlet Servers. Steady servers (a la carte) serving banquets when on duty shall receive $8.75 in addition to their hourly pay and tips:

K.    Captains. Extra servers acting as banquet captains shall receive an additional $9.65 per meal.

When a captain physically serves a regular station at a function, only then shall the captain participate in the gratuity for that function.

L.    Rotation. All long-end (steady) banquet servers shall be assigned work in rotation. A separate rotation ("wheel") shall be maintained for breakfast, luncheon, dinner, and receptions.



Extra banquet servers shall not be required to report more than one hour before sit down unless required earlier for special reasons.

M.      Other. All banquet servers shall be served in food lines on a first come, first-served basis, except for those serving head tables, and except when a host requests special service arrangements. Long-end (steady) banquet servers will not be required to rack glasses or scrape dishes except to properly stack dishes on trays.

The Hotel shall endeavor to assign extra covers as equally as possible among those servers serving that function.

In order to share in a gratuity, a banquet server must be assigned a station and physically serve said station.

N.      New Year's Eve.

| New Year's Eve Rates (8 hours) | |
|---|---|
| **Classification** | **8/1/18** |
| Bartenders | $52.20 |
| Servers | $43.00 |
| Captains & Hostesses | $49.00 |
| Head Servers | $53.00 |
| Barpersons | $44.00 |
| Buspersons | $44.00 |

These New Year Eve rates will be paid in lieu of the hourly rate to a la carte employees working on New Year's Eve function in function facilities for the duration of the function plus one (1) hour in advance of service but in no event for more than eight (8) hours for which period extra banquet servers will be paid double the meal rate.

O.      Banquet Referral. The Employer shall have the sole right to establish the operation and rules for its banquet referral lists. The decision of the Employer in exercising its rights under this section shall not be subject to the grievance and arbitration procedure. In establishing its own list and hiring hall, banquet employees shall be subject to the Union security clause or pay a service fee, as negotiated by the parties.

The Employer must maintain preferred and roll call extra banquet employee lists in addition to their long-end banquet employees.

The parties agree on the principle that extra banquet work (after long-end, preferred on-call, and on-call) should be made available to the extent reasonably possible to qualified employees in other classifications. To that end, the Employer and the Union will confer on a system for that purpose. In addition, the Employer and the Union will focus on appropriate banquet training for employees. The Employer shall have the sole right to establish the operation and rules for extra work procedures. The decision of the Employer in exercising its rights under this paragraph shall not be subject to the grievance and arbitration procedure.



## Article 43
### Alcohol & Drug Abuse Preventive Program

In the interest of maintaining a safe and healthy work environment, the parties agree as follows:

A. All employees as a condition of employment shall be required to undergo drug and alcohol testing whenever:

1. there is reasonable cause to believe that an employee may be under the influence of drugs or alcohol;
2. an employee is injured on the job and requires medical treatment in a hospital setting;
3. an employee is involved in a work-related accident which involves injuries to others which requires treatment in a medical facility and transportation by emergency medical technicians or property damage exceeding $10,000;
4. it is a part of the terms and conditions of a drug and/or alcohol "last chance" agreement.

B. Employees taking drugs as prescribed by a licensed physician for a personal illness shall not be considered in violation of Hotel policy. Employees taking medication which may affect their fitness for duty and/or job performance are required to consult with Human Resources prior to commencing work. Human Resources may not prevent an employee from working if the employee files a letter signed by a physician stating that he or she understands the nature of the work and in his or her opinion the prescribed medication will not render the employee unsafe or unable to properly perform his or her job.

C. Testing may be done by hair, breath, saliva or urine as the circumstances require. (Testing shall only be performed by a qualified testing organization (including a hospital). The parties shall agree upon a list of the regular providers of such testing services to the Employer. Said determination shall be made by a certified Substance Abuse Professional (SAP) or a person licensed by the Commonwealth of Mass. as an Alcohol and Drug Abuse Counselor (LADAC) in addition to the hotels current drug testing facilities and appropriate hospitals.

D. Discipline and consequences of positive test results or refusal to submit a sample.

1. An employee who refuses to submit, cannot submit, or who attempts to alter or tamper with a sample will be deemed to have failed the test.

2. Although the Hotel reserves the right, in appropriate cases, to terminate, an employee who tests positive for drugs and/or alcohol or is deemed to have failed the test may be returned to work after consulting with the Union and the Employer following an appropriate professional evaluation by Modern Assistance Programs or any other agreed upon organization.

E. Employee assistance drug and alcohol education and training.

1. The Hotel will support drug and alcohol education and training programs in conjunction with the Union.

2. Referrals, counseling, treatment are available through the Union Health and Welfare Plan. If an employee with a substance abuse issue contacts Human Resources or a member of management to request assistance, the Employer will work with the Union to provide needed assistance. Such contact, however, shall not insulate an employee from discipline for policy violations, misconduct, absenteeism or performance problems or excuse him/her from future compliance with Hotel safety and performance standards and work rules.

The Hotel must notify the Union immediately of its intention to administer drug testing.

## Article 44
### Lateral Service

In order to support the mission of service in the Hotel, a high degree of cooperation with managers and with workers is required. In order to promote cooperation in the workplace, managers and workers are encouraged to develop ongoing communication. This provides opportunities to explore ways to accomplish the needs of the Hotel while recognizing the personal styles and needs of each worker. Consistent with the needs of the workplace, the Union recognizes that cooperation can be beneficial to both the worker and the Hotel.

Management may, using reasonable discretion, utilize a policy of lateral service for brief periods of time to satisfy guests' and the Hotel's needs. Lateral service is designed to allow employees to help where needed until guest needs are satisfied. It is not designed to be, nor will become, a job combination program nor a permanent cross-utilization initiative.

Hotel supervisors may perform bargaining unit work under the following circumstances:

1. Pursuant to lateral service.

2. Emergencies (unforeseen occurrences).

3. For training purposes (which will not be used as a substitute for the creation of additional bargaining unit positions or to replace a current bargaining unit employee).

4. To introduce new methods of operation or procedure.

## Article 45
### Subcontracting

The Employer agrees to not subcontract out its current bargaining unit work, as defined by Article 1.

UNITE HERE Local 26

The Employer retains the right to use the retail space on the first floor as a restaurant or for any other purpose, and notwithstanding paragraph 1, to subcontract/sublease the space to any entity. Any employees employed either by the Employer or by such subcontractors in such space(s) shall continue to be excluded from the bargaining unit, and not subject to the terms of this Agreement.

## Article 46
## Immigration

The Union and the Employer have a mutual interest in avoiding the termination of trained employees. Accordingly, to the extent not addressed by this Agreement, at the request of the Union, the Employer will meet and discuss issues related to compliance with the Immigration Reform and Control Act and any other current or future legislation, government rules or policies related to immigrants which impact bargaining unit employees.

A.      Non-Discrimination. No employee covered by this Agreement shall suffer any loss of seniority, compensation, or benefits solely due to any changes in the employee's name or social security number, provided that the new social security number is valid and the employee is authorized to work in the United States. The Employer shall not take action against an employee solely because the employee is subject to an immigration proceeding where the employee is otherwise permitted to work.

B.      Workplace Immigration Enforcement. The Employer shall notify a representative of the Union as soon as practical if the Employer receives a no-match letter from the Social Security Administration, if it is contacted by the Department of Homeland Security (DHS) or, (formerly the INS) related to the immigration status of an employee covered by this Agreement or if a search and/or arrest warrant, administrative warrant, subpoena, or other request for document is presented. The Union agrees that it shall keep confidential any information it obtains pursuant to this provision and that it will use any such information solely to represent and/or assist the affected employee(s) in regard to the DHS matter.

Recognizing the intent of the Article, the Employer will admit agents of the DHS only as it deems necessary and appropriate.

The Employer shall permit inspection of I-9 forms by DHS or DOL only after a minimum of (3) three days written notice or other such period of time as provided by law or where such inspection is otherwise in accordance with the provisions of this Section. The Employer also shall permit inspection of I-9 forms where a DHS search and/or arrest warrant, administrative warrant, subpoena or other legal process signed by a federal judge or magistrate specially names employees or requires the production of I-9 forms. The Employer shall not provide documents other than the I-9 forms to DHS for inspection or reveal to the DHS the names, addresses or immigration status of any employees in the absence of a valid DHS administrative subpoena, or a search warrant or subpoena signed by a federal judge or magistrate or where otherwise required by law or it is otherwise deemed by the Employer to be appropriate under the circumstances.

To the extent legally possible, the Employer shall offer a private setting for questioning for employees by DHS.



C.    Reverification of Status. The Employer will provide an employee with a least sixty (60) days' notice that the documents provided by the employee demonstrating work authorization are scheduled to expire and that the employee will need to re-verify their I-9 documentation and provide valid evidence of continued work authorization. Such notice will be provided to an employee through an electronic message to the employee's account in the Employer's human resource system. If the human resource system is unavailable. the Employer may provide notice to the employee at the time clock, by mailing a notice to the employee's address on file. and/or by direct communication from the employee's manager or human resources office.

1.    No employee employed continuously on or before November 6, 1986, shall be required to document immigration status.

2.    The Employer shall not retain in its files copies of the identity and work authorization documents presented by the employee.

3.    The Employer shall not require or demand proof of immigration status, except as may be required by 8 USC 1324a (1)(B) and listed on the back of the I-9 form or as otherwise required by law.

4.    In the event of a sale of the business of its assets, the Employer shall offer to transfer the I-9 forms of its employees to the new employer or, at the Employer's option, to jointly maintain the I-9 forms of its employees with the successor employer for the period of three (3) years, after which the successor employer shall maintain said forms.

5.    The Employer shall not take adverse employment action against an employee based solely on the results of a computer verification of immigration or work authorization status.

D.    Social Security No-Match Letters. In the event that the Employer receives notice from the Social Security Administration ("SSA") that one or more of the employee names and Social Security numbers ("SSN") that the Employer reported on the Wage and Tax Statements (Forms W-2) for the previous tax year do not agree with the SSA's records, the employer agrees to the following:

1.    Provide a copy of the notice to the employee and the Union upon receipt;

2.    The Employer agrees that it will not take any adverse action against any employee listed on the notice, including firing, laying off, suspending, retaliating, or discriminating against any such employee, solely as a result of the receipt of a no match letter;

3.    The Employer agrees that it will not require employees listed on the notice to bring in a copy of their Social Security card for the employer's review, complete a new I-9 form, or provide new or additional proof of work authorization or immigration



status solely as a result of the receipt of a no-match letter, unless otherwise required to avoid risk of prosecution, and

4.      The Employer agrees not to contact the SSA or any other government agency, solely as a result of receiving a no-match from the SSA.

E.      Seniority and Leave of Absences for Immigration Related Issues. Upon request, employees shall be released for up to five (5) unpaid working days per year during the term of this Agreement in order to attend to DHS proceedings and any other related matters for the employee and the employee's immediate family (parent, spouse, and/or dependent child). The Employer may request verification of such leave.

The Employer shall not discipline, discharge, or discriminate against any employee because of national origin or immigration status, or because the employee is subject to immigration or deportation proceedings, except as required to comply with the law. An employee subject to immigration or deportation proceedings shall not be discharged solely because of pending immigration or deportation proceedings, so long as the employee is authorized to work in the United States.

If an employee obtains appropriate work authorization within five (5) years after losing work authorization status solely as a result of change in DACA, DAPA, or TPS status, the employee must provide documentation of the work authorization and return to work within six (6) months after obtaining it or forfeit the leave provided in this subsection. The reinstated employee will displace the least senior employee in the employee's former job classification. An employee will not accrue vacation or the other benefits based upon particular plan policies during such absence.

In the event that an employee has a problem with his or her right to work in the United States, after completing his or her introductory or probationary period, the Employer shall notify the Union in writing, and upon the Union's request, agrees to meet with the Union to discuss the nature of the problem to see if a resolution can be reached.  Whenever possible, this meeting shall take place before any action by the Employer is taken.

In the event that an employee does not provide adequate proof that he/she is authorized to work in the U.S. following his/her probationary or introductory period, and his/her employment is terminated for this reason, the Employer agrees to immediately reinstate the employee to his/her former position, without loss of prior seniority (but length of service for vacation or other benefits does not continue to accrue during the period of absence) upon the employee providing proper work authorization within 12 months from the date of termination.

If the employee needs additional time, the Employer will rehire the employee into the next available opening in the employee's former classification, as a new hire without seniority, upon the employee providing proper work authorization within a maximum of 12 additional months. The parties agree that such employees would be subject to a probationary period in this event.

The Employer will furnish to any employee terminated because he/she has not provided adequate proof he/she is authorized to work in the U.S. a personalized letter stating the employee's rights and obligations under this section.

The provisions in Article 9 on pro-rated vacations for terminated employees shall not apply to employees covered by this section.

F.     Limited English Proficient Employees. While English is the language of the workplace, the Employer recognizes the right of employees to use the language of their choice when speaking amongst themselves during work hours provided that such conversation are conducted in a manner that is respectful of guests and other employees and is consistent with quality guest services.

Upon request of the employee, the Employer shall provide interpreters from its staff, where such staff is available, for employees not fluent in English during any investigation interview that may lead to discipline or discharge. Where the Employer is unable to so provide an interpreter, the Union may provide an interpreter.

G.     Paid Day Off to Become a Citizen. On the day an employee becomes a U.S. citizen, the Employer will compensate the employee with a one (1) time paid personal holiday in recognition of his or her citizenship.

## Article 47
## Diversity

A.     Commitment to diversity. The Employer is committed to a comprehensive approach to a diverse workforce, practicing equal employment opportunity and engaging in affirmative efforts to create and maintain an environment that supports and encourages the contribution of all employees. We shall strive to have a productive and hospitable environment with a work force reflective of the diversity in the greater Boston area. The Employer is committed to respect the needs of the current workforce, which is composed primarily of immigrants from many different parts of the world. We are proud of that diversity and the benefits it brings to our hotels and the hotel industry in general.

B.     Affirmative Steps. In addition, if necessary, the Employer shall take affirmative steps to further diversify the workforce to properly reflect the greater Boston area, including African-American workers, by:

1.  Cooperating with a diversity Ombudsperson, selected by the parties, in accordance with Paragraph 8, hereafter.

2.  Participating in good faith in a "Citywide Diversity in the Hospitality Industry Taskforce", with at least one senior Management Representative from each hotel, senior Union Representatives, and Community Representatives to be selected by the Mayor of the City of Boston. Recognizing that fresh approaches require acceptance by the hotels and the employees represented by the Union, the taskforce shall operate through consensus recommendations and decisions as it works towards developing and implementing

43

initiatives, programs and/or recommended policy and/or procedural changes within the industry. It is a key function of the Ombudsperson to facilitate that consensus building process, to determine if a consensus has been achieved within the respective groups comprising the Taskforce and, if appropriate, to make recommendations to the Taskforce to avoid or resolve impasses within it.

3. Providing the Taskforce with hiring, promotion and recruitment data from each of the hotels. The parties agree that all Hotel-specific data shall be combined with the data of other hotels and presented in such a format as to ensure that no committee person can identify what information came from an individual hotel or employer. The Ombudsperson shall contract with a labor economist or other data specialist to perform this data blending and analysis. Both the Ombudsperson and the data specialist shall sign appropriate confidentiality agreements regarding all information and data obtained in their official capacities.

4. The Taskforce shall meet regularly, as it so determines and at least quarterly, beginning as soon as practicable after this Agreement has been executed and ratified, the members of the Taskforce appointed and the Ombudsperson selected.

5. The mission of the Taskforce shall be to:

   a. Develop an Outreach program that informs and educates the Community about job opportunities and availability in the hotels covered by agreements with the Union.

   b. Review and make recommendations to the hotels regarding suggested amendments to the application and hiring procedures that may present obstacles to members of the African-American and broader diverse community members.

   c. Work with existing Community job development and training programs that will assist Employers in identifying potential job applicants.

   d. Use the resources available in the Greater Boston Hotel Employees/Local 26 Education/Training Program to further the efforts of the Taskforce.

   e. Track the results of these efforts for the duration of this Agreement in a formal report twice yearly to the members of the Taskforce.

   f. The work of this Taskforce will not supersede any rights of the Employer and the Union in this Agreement. Nothing herein shall require the Employer to violate its own AAP.

6. The Employer further pledges to participate in good faith in a Hotel Diversity Committee. The Hotel Diversity Committee shall have equal numbers of senior management and senior union representatives. The Committee shall meet twice a year for the duration of this Agreement. The Committee shall be provided with Hotel-specific hiring, promotion and recruitment data which may be analyzed with the assistance of the Ombudsperson. The



purpose of the Committee shall be to assess the success of the Hotel's hiring, promotion and recruitment practices when compared with the benchmarks and recommendations of the Citywide Taskforce. The Employer pledges to negotiate in good faith with the union to correct any failures to follow the recommendations and benchmarks described by the Citywide Taskforce.

7. The mission of the Ombudsperson shall be to serve as an ex-officio member of the Citywide Taskforce and any Hotel Diversity Committee, as needed, with full access to its deliberations and records; to meet with the responsible executives of the Employer, with or without the presence of Union representatives at the Ombudsperson's discretion, to discuss specific complaints by employment applicants about the Employer's hiring practices or decisions; to recommend to the Employer specific measures to deal with these complaints; to coordinate the analysis of any data provided by the hotels and to recommend to the Taskforce long-term systemic policies to insure diversity. All reasonable costs of the Ombudsman and Labor Economist or data specialist shall be divided equally among all hotels signatory to this agreement.

8. The Ombudsperson shall be jointly selected by the Union and the employer-members of the Taskforce, with the Union and the Employers as a group, each having one vote. If the parties fail to agree, they shall request the American Arbitration Association to provide a list of 8-10 candidates with appropriate education and experience in the diversity field nationally and qualified to assist the parties in achieving their goals hereunder. The parties shall select from said list by alternate strikes. The Union and the Employer group together shall have the right to terminate the services of the Ombudsperson.

9. All information provided or made available to the Ombudsperson, the Taskforce or the Hotel Diversity Committee shall be deemed confidential and proprietary. Under no circumstances may advice or recommendations or conclusions of the Ombudsperson or of the Taskforce or any member thereof, or any information made available to the Ombudsperson (collectively, "information"), the Taskforce or the Diversity Committee, as the case may be, be disclosed to any person except to a member of the Taskforce or Diversity Committee, who has signed an appropriate confidentiality provision, nor may such information be used in any proceeding or forum, without the express written consent of the Employer. It is recognized that the Ombudsperson may be requested by the Taskforce to undertake a public role in connection with Taskforce initiatives and to that end may be authorized by the Taskforce to disclose specific information. Similarly, community representatives on the Taskforce, if asked to undertake activity on its behalf, will be authorized by the Taskforce to use such information as is necessary to accomplish the objective asked of them. The above references empowerments and authorizations shall require the joint consent of the Union and the group of hotels, and shall be deemed provided by request(s) to undertake such public roles.



UNITE HERE Local 26

## Article 48
## Food & Beverage Operations

If the Employer seeks to change the current food and beverage operations, the parties will meet and negotiate regarding those changes.

If the parties are unable to reach an agreement, the Employer may propose modifications to Hours and Overtime, Lateral Service, position consolidations or eliminations, as well as wages, health, welfare, and retirement benefits for employees in the food and beverage operation. This process also applies to changes in the mix of food and beverage offerings in the Hotel (except banquets), which includes converting a space to a substantially different operation or shifting food and beverage availability from one space to another in generally contemporaneous changes, but not to include the complete closure of an outlet without any substitution of service. The Employer shall submit its proposal to the Union in writing at least ninety (90) days in advance of its proposed effective date and offer to bargain with the Union over the proposal.

If at the end of that 90-day period, the parties have not reached an agreement, the Union shall have the right to strike after notification by the Employer of its intent to implement its final proposal. The Union's decision to strike and the Employer's decision to implement its final proposal shall be made within thirty (30) days after the expiration of the 90-day period. If the Employer decides to implement its final proposal it will not include the elimination or replacement of any Union health, welfare, and retirement benefit plans.

## Article 49
## Technology

A.      Workplace Changes. Technological change includes the use of automation, machines, computers, robots, software, tablets or other handheld devices that replace or substitute for or materially increase or decrease the type or manner of work performed by employees in the Employer's workplace.

B.      Notice and Opportunity to Bargain. The Employer shall provide the Union at least 30 days' notice before implementation of any plans to upgrade, modify, improve, or extend technology currently in use by bargaining unit employees that are made after the effective date of this Agreement. The Employer shall provide the Union at least 165 days advance notice prior to the implementation of any new technological change, occurring after the effective date of this Agreement, that replaces or substitutes for or materially increases or decreases the type or manner of work performed by employees at the Hotel.

With respect to the implementation of new technology and subject to appropriate confidentiality agreements, the Employer shall explain to the Union the intended function of the new technology, the nature of the technology and who will develop it, the timing of its planned implementation, and the expected work needed to implement the technology and keep it running, and where available shall share prototypes. If the Union requests to bargain, it must do so within fifteen (15) days of the Employer's notice and shall include any information requests with such notice. The Employer shall promptly negotiate the impact of the new technology on the bargaining unit

46

employees and the work they perform. Upon notice of a demand to negotiate, the process shall be governed by the following rules:

1. _Information_: The Employer shall provide any information requested by the Union within twenty (20) days of receipt of the notice. The Union shall be afforded up to thirty (30) days, following receipt of requested information to meet with affected employees.

2. _Negotiation_: At the conclusion of the initial information gathering period, the parties shall meet over the following fifty (50) days in an attempt to reach a resolution.

3. _Mediation_: Should the parties fail to resolve the issue within fifty (50) days from when the negotiation period opens, either party may request the services of a federal mediator.

4. _Implementation_. The Employer shall not implement any technology during such negotiations, but the Employer shall have the right to implement the technology upon the expiration of this 165-day period. The Employer shall not implement any technology unless the Employer has carried out these duties to the Union.

This notice and negotiation process shall be the sole and exclusive procedure for resolving disputes over the implementation of new technology. Any disputes arising out of this process shall be subject to Article 20. The arbitrator, however, shall have no authority to order any particular outcome to the bargaining process.

C.       _Displacement_. Any employee displaced due to technological change shall be entitled to recall to the classification from which the employee was displaced for 24 months following the date of displacement and to preference for other job openings at the Hotel, in or out of the bargaining unit, after all other preferences possessed by incumbent employees at the Hotel have been exercised but before new employees are hired, provided the employee is qualified for the position or can be qualified in a reasonable period of time with adequate training provided by the Employer. Preference in hiring also will be given to any employee displaced due to technological change, who applies for another position for which he or she is qualified, at other Employer-operated hotels or condos subject to a collective bargaining agreement with a UNITE HERE! affiliate and within the same State as the hotel from which the employee was displaced.

D.       _Job Openings_. The Employer shall make all non-supervisory job postings electronically accessible to employees laid off under this subsection and to the Union to assist employees in their job searches.

E.       _Other Available Work_. While employees are waiting for an offer of a permanent position, the Employer shall offer all available extra work within their classification to them in order of classification seniority.

F.       _Recalled Employees_. If an employee displaced under this subsection is recalled to (1) another position within the Union's bargaining unit at the Hotel, the employee shall retain his or her house seniority and continuous service for vacation purposes, or (2) to a position outside the bargaining unit represented by the Union, continuous service with the Employer shall be



recognized for vacation/PTO and health insurance purposes. If an employee displaced by technological change is hired into a new position at other Employer-operated hotels or condos subject to a collective bargaining agreement with a UNITE HERE! affiliate and within the same State as the hotel from which he or she was displaced, the provisions of that hotel's collective bargaining agreement shall apply.

No employee who has completed his or her probationary period and is recalled pursuant to this subsection shall be required to complete a new probationary period but if the employee cannot perform satisfactorily the work on the shift or station to which recalled he or she may transfer or be transferred back to layoff status within thirty (30) days after his/her date of recall.

G.     Health Contributions. The Employer shall continue to make contributions to UHH for any employee displaced as a result of the implementation of new technology, at the minimum level necessary to maintain existing benefits for six (6) months following the date of displacement.

H.     Severance. If an employee displaced under this subsection elects not to seek another position with the Employer at the outset of the displacement or is not offered another position during the 24-month job search period, he/she will be permanently laid off and offered the opportunity to execute a severance agreement to include a payment equal to one week of pay for every year of service, subject to all legally required taxes and withholdings and a general release of claims.

I.     Reduction of Duties and Technological Maintenance. If technological changes reduce the duties of a classification without eliminating them, the classification shall continue to exist, but the Employer may adjust staffing levels, full or part-time status, or after bargaining with the Union the Employer may consolidate existing classifications or distribute the remaining duties to other bargaining unit classifications . If new technology performs functions previously performed by bargaining unit employees and requires human operation of machines, the machines shall be operated by bargaining unit employees and the Employer shall train employees in the affected classification to operate new technology. If the machines used by bargaining unit employees require daily maintenance to ensure the continued operation, then bargaining employees will be trained to perform the work, unless such work is of the kind typically performed by other bargaining units or the Company's IT department. The Employer may limit training to those employees who volunteer to be trained. Training opportunities shall be offered in accordance with house seniority among those in the affected classification. The Employer shall allow up to two (2) Union representatives to be present to observe the training but to not participate in it. If operation requires a level of skill which may practically be obtained only through academic study, and the necessary courses are offered at educational institutions in the county where the hotel is located, the Employer shall pay the tuition and fees of an employee taking such coursework, up to- maximum amounts agreed to between the Employer and the Union. The Employer shall not be obligated to pay for the time employees spend in the coursework. If an employee completes the coursework successfully (average grades of at least "C") the Employer shall offer the employee the work of operating the machine(s) associated with the employee's former job functions. Such offers shall be for the next available position performing this work following the employee's completion of this coursework.



## Article 50
### Termination

This Agreement shall remain in full force and effect from August 1, 2018 until midnight January 31, 2023. This Agreement shall automatically be renewed in full force and effect from year to year after January 31, 2023 unless the Union or the Employer gives at least 60 days' written notice prior to January 31, 2023 or such notice prior to August 1 in any following year to the other party hereto. In the event that this Agreement shall be terminated in accordance with the above provisions, it is agreed that no strike or lockout of any kind shall be caused or permitted by either party while negotiations are pending for a new agreement, unless at least five days' written notice by registered mail is given to other party.

**In Witness Whereof** the parties hereto by their duly authorized representatives have affixed their hands and seals on the ___ day of _____.

**Employer:**
**Highgate Hotels, L.P. for the Courtyard Boston Cambridge**

By _____
   Michelle Laboy Cohen,  VP of Human Resources

**UNITE HERE Local 26:**

By _____
   Brian Lang, President

49

UNITE HERE Local 26

**Appendix A**
**Minimum Rates**

| Kitchen | 8/1/2018 | 8/1/2019 | 8/1/2020 | 8/1/2021 |
|---------|----------|----------|----------|----------|
| Cook | $23.39 | 24.52 | * | * |
| Steward | $22.79 | 23.80 | * | * |

| Food & Beverage Outlet | 8/1/2018 | 8/1/2019 | 8/1/2020 | 8/1/2021 |
|------------------------|----------|----------|----------|----------|
| Server | $22.10 | 23.11 | * | * |
| Host/Cashier | $22.67 | 23.68 | * | * |

| Banquet | 8/1/2018 | 8/1/2019 | 8/1/2020 | 8/1/2021 |
|---------|----------|----------|----------|----------|
| Server | $22.84 | 23.85 | * | * |
| House person | $22.84 | 23.85 | * | * |

| Front Office | 8/1/2018 | 8/1/2019 | 8/1/2020 | 8/1/2021 |
|--------------|----------|----------|----------|----------|
| Guest Service Agent | $23.09 | 24.10 | * | * |

| Housekeeping | 8/1/2018 | 8/1/2019 | 8/1/2020 | 8/1/2021 |
|--------------|----------|----------|----------|----------|
| Room Attendant | $22.84 | 23.85 | * | * |
| House Attendant | $22.84 | 23.85 | * | * |

| Engineering | 8/1/2018 | 8/1/2019 | 8/1/2020 | 8/1/2021 |
|-------------|----------|----------|----------|----------|
| Utility** | $23.98 | 23.85 | * | * |

*Increases to be determined by Union pursuant to Article 10

**Appendix B**
**Letter of Agreement**

It is understood and agreed by both parties that any separate agreements made between the Union and the Employer signatory to the 2018 to 2023 Agreement which have not heretofore been revoked by the parties shall continue in full force and effect for the duration of this Agreement unless the Union and the Hotel involved in any such separate agreement shall mutually agree to amend or revoke any such agreement.

_____
President Brian Lang
For Local 26

_____
Michelle Laboy Cohen, VP of Human Resources
For the Employer

### Appendix C

1.      The parties hereby establish the following procedure for the purpose of ensuring an orderly environment for the exercise by the employees at any hotel described in the last paragraph of Article 1 of the Agreement (hereinafter referred to respectively as "Hotel" and "Employees") of their rights under Section 7 of the National Labor Relations Act and to avoid picketing and/or other economic action directed at the Employer in the event the Union decides to conduct an organizing campaign among Employees.

2.      The parties mutually recognize that national labor law guarantees employees the right to form or select any labor organization to act as their exclusive representative for the purpose of collective bargaining with their employer, or to refrain from such activity.

3.      The Employer will take a positive approach to unionization of Employees. The Employer will not take any action nor make any statement that will directly or indirectly state or imply any opposition by the Employer to the selection by such Employees of a collective bargaining agent, or preference for or opposition to any particular union as a bargaining agent.

4.      The Union and its representatives will not coerce or threaten any Employee in an effort to obtain authorization cards.

5.      Whenever the Employer finds it necessary to hire new Employees for vacancies in job classifications covered by this Agreement at a Hotel, the Employer shall notify the Union to request applicants for such vacancies. When requesting applicants, the Employer shall state the qualifications applicants are expected to possess. The Union may furnish applicants for the job vacancies specified by the Employer. The Union's selection of applicants for referral shall be on a non-discriminatory basis and shall not be based upon or in any way affected by membership in the Union or the Union's by-laws, rules, regulations, constitutional provisions, or any other aspects or obligation of Union membership policies or requirements, or upon personal characteristics of an applicant where discrimination based upon such characteristics is prohibited by law. The Employer agrees that any interest demonstrated by an applicant in joining the Union shall not constitute grounds for discriminatory or disparate treatment nor adversely impact the applicant's ability to be hired by the Employer. The Employer shall be the sole judge of an applicant's suitability, competence and qualifications to perform the work of any job to be filled.

6.      If the Union provides written notice to the Employer of its intent to organize Employees at a Hotel, the Employer shall provide access to the premises of the Hotel and to such Employees by the Union. The Union may engage in organizing efforts in non-public areas of the Hotel during Employees' non-working times (before work, after work, and during meals and breaks) and/or during such other periods as the parties may mutually agree upon.

7.      Within ten (10) days following receipt of written notice of intent to organize Employees at a Hotel, the Employer will furnish the Union with a complete list of such Employees, including both full and part-time Employees, showing their job classifications and departments. Within two (2) weeks thereafter, the Employer will furnish a second list of such Employees to the Union, including the addresses of all Employees. Thereafter, the Employer will provide updated complete

lists monthly. The Union will indemnify and hold the Employer harmless from any liability and costs of litigation arising from any lawsuit filed by an employee of the Hotel because the Employer has released to the Union the address of the employee, or to restrain the Employer from releasing the employee's address.

8.   The Union may request recognition as the exclusive collective bargaining agent for such Employees. James Litton, or another person mutually acceptable to the Employer and the Union, will conduct a review of Employees' authorization cards and membership information submitted by the Union in support of its claim to represent a majority of such Employees. If that review establishes that a majority of such Employees has designated the Union as their exclusive collective bargaining representative or joined the Union, the Employer will recognize the Union as such representative of such Employees and will extend to such employees the Agreement between the Union and the Employer together with any amendments agreed to by the parties. The Employer will not file a petition with the National Labor Relations Board for any election in connection with any demands for recognition provided for in this agreement. The Union and the Employer will not file any charges with the National Labor Relations Board in connection with any act or omission occurring within the context of this agreement; arbitration under Paragraph 12 of this Appendix, shall be the exclusive remedy.

9.   The Union will not engage in picketing or other economic activity at any Hotel covered by this Appendix, and the Employer will not engage in a lockout of the Employees. This paragraph will expire with respect to any group of Employees upon recognition of the Union as the representative of such Employees pursuant to paragraph 8; provided, however, if the Employer recognizes any union besides Union as the exclusive collective bargaining representative of Employees, or any of them, this paragraph shall terminate immediately and without notice.

10.   No work traditionally performed by Employees in the classifications covered by this Agreement shall be performed in any operation covered by Article 1 of the Agreement under any sublease, subcontract, or other agreement unless the terms of any lease, contract or other agreement are consistent with provisions of Articles 45 and 26 of the Collective Bargaining Agreement.

11.   This Appendix and the last paragraph of Article 1 of the Agreement shall survive the expiration or termination of the Agreement, provided that in the event the Union is recognized at a time when no current collective bargaining agreement is in effect with the Employer, then the terms and conditions to be extended to Employees in an operation upon recognition of the Union pursuant to Paragraph 8 shall be the terms and conditions then legally applicable to employees of the Employer until a new collective bargaining agreement exists, at which time such new agreement shall apply.

12.   The parties agree that any disputes over the interpretation or application of this Agreement shall be submitted to expedited and binding arbitration, with James Litton serving as the arbitrator. If he is unavailable to serve within fourteen (14) calendar days of notification then Larry Holden, or another mutually acceptable person, shall be the arbitrator. The arbitrator shall have the authority to determine the arbitration procedures to be followed. The arbitrator shall also have the authority to order the non-compliant party to comply with this Agreement. The parties hereto agree to comply with any order of the arbitrator, which shall be final and binding, and furthermore,

UNITE HERE Local 26
_____

consent to the entry of any order of the arbitrator as the order or judgment of the United States District Court for the District of Massachusetts, without entry of findings of fact and conclusions of law.

13.     All bargaining unit work at one (1) restaurant shall be performed only by members of the bargaining unit covered by the Agreement (or as provided by Paragraph 10 above). During the first twelve (12) months of operation, the Employer may establish the terms and conditions of employment for all employees working in that restaurant, except that the employees may participate in the benefits offered by the Employer. The employees of that (1) one restaurant shall be covered by the terms and conditions of the Agreement after twelve (12) months of operation, provided they have been recognized.

14.     This Agreement shall be in full force and effect from the date it is fully executed on behalf of the employer and the Union until three (3) years from the official public opening of the hotel, or if sooner upon recognition of the Union and the extension of the Agreement to the Hotel.

Courtyard Boston Cambridge

## Appendix D

### Steakhouse & Sushi Bar – First Floor
### Restaurant & Lounge – Second Floor

It is agreed by and between the Union and the Employer that the employees of the Bisuteki Tokyo Japanese Steakhouse and Sushi Bar (and its successor(s), if any) at the 777 Memorial Drive location are excluded from the unit set forth in the Agreement currently in effect. Bisuteki employees may prepare and serve sushi in the second floor lounge.

President Brian Lang
For Local 26

Michelle Naboy Cohen. VP of Human Resources
For the Employer

55

UNITE HERE Local 26

**Appendix E**
**REIT Owner Successor Letter**


Brian Lang
President
UNITE HERE Local 26
33 Harrison Avenue, 4th Floor
Boston, MA 02111

Re:     Courtyard Boston Cambridge

Dear Mr. Lang:

As you are aware, _____ ("Owner") is the owner of the Courtyard Boston Cambridge ("Hotel"), and _____ ("Operator") is the manager of the Hotel and the employer of all of the Hotel's employees. Operator and UNITE HERE Local 26 ("Union") are parties to a collective bargaining agreement covering certain employees at the Hotel ("CBA").

Owner is a Real Estate Investment Trust ("REIT"). Owner represents that in order to maintain its status as a REIT, under applicable law, it is not permitted to engage any employees in the operation of its assets or to itself operate or manage the Hotel, and, accordingly, that Operator operates the Hotel, employs all of the individuals employed to operate the Hotel, and is the only party to the CBA with respect to the Hotel.

Owner, nonetheless, acknowledges that it and the Union have a common interest in protecting work opportunities for all Hotel employees covered by the CBA. The Union, in accepting this letter, acknowledges that the Owner needs the flexibility to select from time to time the operating entity best suited to realization of the Owner's business objectives, and that this can be accomplished without injury to the interests of the employees in the bargaining unit.

1.      Owner agrees that while Owner owns the Hotel, the terms of any future operating agreement or management contract covering the Hotel shall expressly require a written assumption of the CBA including a promise that the successor or successors shall retain the employees employed in the bargaining unit represented by the Union (subject to changes in the level of staffing) and Owner shall furnish a copy of any such written assumption to the Union. Owner shall require that the employment of bargaining unit employees retained will continue uninterrupted without loss of seniority, compensation, benefits or other terms and conditions of employment subject to the CBA and applicable law. No provisions, terms or obligations contained in the CBA shall be affected, modified, altered or changed in any respect whatsoever by a change in the management entity and the assumption of the CBA. Owner's obligations under this Letter Agreement shall survive the assumption of the CBA by the current management entity or by any subsequent replacement management entity that has assumed the CBA.

2.    Owner shall require that, if operation of the Hotel is transferred to a replacement management entity, the Operator will, to the extent Operator has such documents, transfer to the new management entity completed Forms I-9 for all bargaining unit employees, and direct the successor management entity to maintain these Forms I-9 in lieu of completing new Forms I-9 for bargaining unit employees. The foregoing obligation shall not apply where no such forms are required by domestic law or where applicable law mandates the successor management entity, without regard to any voluntary election by that entity, to require bargaining unit employees to complete new I-9 forms, and shall not prohibit the new management entity from taking reasonable actions and/or requiring employees to take reasonable actions to correct material omissions and errors in I-9 forms received from Operator. Nothing in this provision shall be construed to require the Operator or any successor management entity to employ individuals who are not authorized to work in the United States, or to prohibit the Operator or any successor management entity from conducting an E-Verify review of I-9 forms received from a predecessor if such E-Verify review is mandated pursuant to the Operator's or successor management entity's status as a federal government contractor or by other provision of law or to prevent Operator from complying with any immigration related obligations it has as a federal contractor or by other provision of law as they may be changed from time to time.

3.    Should Owner or a direct or indirect subsidiary of Owner sell or otherwise transfer a controlling ownership interest in all or any part of the business of the Hotel (in one or a series of related stock or asset transactions), or in the event there is a change in the form of ownership of the Hotel or assets to which Owner is a party, then Owner shall, as a material condition to such transaction, obtain from the other part(ies) to the transaction who will take thereby any interest in the business or assets used in the business ("Transferee") one of the following: (x) if the Transferee is a REIT, a written assumption of this Letter Agreement or (y) if the Transferee is not a REIT entity and is not itself an operator of the Hotel, either directly or indirectly through an affiliate, a written assumption of the provisions of the CBA applicable to the Hotel owners that are not also employers of bargaining unit employees (the "Owner Obligations"), or (z) if the Transferee is not a REIT and is itself an operator of the Hotel, either directly or indirectly through an affiliate, a written assumption of the CBA. Owner Obligations shall include in the case of a transferee that is not a REIT entity and will not operate the Hotel the obligation to insure that any operator it retains to operate the Hotel will assume the CBA.

4.    In no event shall Owner be responsible for obligations under this Letter Agreement that arise from and after the date it transfers all or a controlling interest in the Hotel to another entity that has agreed to be bound by the CBA, the Owner Obligations under the CBA, or this Letter Agreement, as the case may be.

5.    Nothing in this Letter Agreement or in the CBA shall be construed to preclude an Owner or any other party in interest from contracting for the use of space that is not controlled or managed by the Operator as an existing part of the hotel operation, or preclude the continued leasing or future leasing whether to the current or any other lessee of any space currently leased in the Hotel. Further, nothing in this Letter Agreement or the Local CBA shall be construed to preclude the leasing of space currently controlled by the Operator to a different third party provided that the new lessee abides by the provisions of sub-section (b) in the following paragraph.

6.     Owner agrees that it will not require Operator to relinquish any part of the Hotel premises managed by the Operator except for (a) use in operations that would not be covered by the CBA if they were conducted by the Operator or (b) use in operations that would be covered by the CBA provided that the economic package paid to or on behalf of employees performing work covered by the CBA shall not be less than the economic package paid to or on behalf of employees under the CBA and shall include an employer-paid defined benefit pension plan. The economic package shall include all emoluments of employment having definite and quantifiable economic value, including but not limited to wages (including premiums, bonuses and incentives, guaranteed workdays or workweeks, health and hospitalization benefits, retirement plan participation, paid vacation, paid holidays and paid sick leave). Nothing in this section or this Letter Agreement generally is intended to expand or otherwise add to the existing bargaining unit covered by the CBA.

7.     Nothing in this Letter Agreement shall be interpreted to create a joint employer relationship between the Owner and the Operator.

8.     The Owner shall not have any obligations to the Union with respect to the Hotel except as are expressly set forth in this Letter Agreement and shall not, solely by virtue of this Letter Agreement, have any obligations to the Union with respect to any property it now owns or in the future may own, other than the Hotel.

9.     This Letter Agreement shall apply during the term of the CBA and shall survive and continue for one (1) year following expiration of the CBA.

10.     Any dispute arising from this Letter Agreement shall be subject to final and binding arbitration under the terms set forth in the sections of the CBA governing grievances and arbitration.

11.     Should any part hereof or any provision herein contained be rendered or declared illegal or an unfair labor practice by reason of any existing or subsequently enacted legislation or by any decree of a court of competent jurisdiction or by the decision of any authorized government agency such invalidation of such part or portion of this Letter Agreement shall not invalidate the remaining portions thereof, provided, however, upon such invalidation, the parties agree immediately to meet and negotiate substitute provisions for such parts or provisions rendered or declared illegal or an unfair labor practice. The remaining parts or provisions shall remain in full force and effect.

12.     The Owner agrees that the Union shall not be required to post a bond or other security as a condition to obtaining an injunction or other equitable relief against a violation or threatened violation of this Letter Agreement.

This Letter Agreement constitutes the entire understanding between the Owner and the Union with respect to employees of the Hotel and may not be modified except by a writing signed by the Owner. It may be executed in two or more counterparts and via facsimile or electronic mail delivery, each of which shall be deemed an original but all of which taken together shall constitute one and the same agreement.

Courtyard Boston Cambridge

Sincerely,


REIT Owner Representative

ACCEPTED:


By: _____
       Brian Lang, President
       UNITE HERE Local 26

UNITE HERE Local 26

**Appendix F**
**Non-REIT Owner Successor Letter**

Brian Lang
President
UNITE HERE Local 26
33 Harrison Avenue, 4th Floor
Boston, MA 02111

Re:     Courtyard Boston Cambridge

Dear Mr. Lang:

As you are aware, 777 Memorial LP ("Owner") is the owner of the Courtyard Boston Cambridge ("Hotel"), and Highgate Hotels LP ("Operator") is the manager of the Hotel and the employer of all of the Hotel's employees. Operator and UNITE HERE Local 26 ("Union") are parties to a collective bargaining agreement covering certain employees at the Hotel ("CBA"). The Operator provided to us and we have reviewed a copy of the CBA between the Union and the Operator, including the obligations of Owner under the provisions concerning successorship (Article 26). Owner hereby agrees to comply with Article 26 of the CBA, all of which is incorporated herein by reference. Nothing in this Letter shall create a joint employer relationship between Owner and Operator or serve as evidence of a joint employer relationship or otherwise create or act as evidence of an employer-employee relationship between the Owner and any employees of the Hotel. Furthermore, nothing in this Letter shall be construed as evidence that the Owner is bound to any provision of the CBA, except as explicitly stated above.

Sincerely,

By: _____
      Owner Representative
      Adam Burinescu
      Authorized Signatory
ACCEPTED:

By: _____
      Brian Lang, President
      UNITE HERE Local 26



**EXHIBIT 13**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SANDRA PADILLA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. _____ |
| ) | |
| HIGHGATE HOTELS, L.P. d/b/a ) | |
| COURTYARD BY MARRIOT, ) | |
| ) | |
| Defendant. ) | |

## AFFIDAVIT OF JUSTIN MAPES

I, Justin Mapes, hereby depose and state as follows:

1.      I am over the age of 18, and I understand and believe in the obligations of an oath. I am employed by the Defendant, Highgate Hotels, L.P. ("Highgate"), as its Deputy General Counsel. The facts set forth in this Affidavit are based on my personal knowledge, and/or on the records that Highgate maintains in the ordinary course of its business.

2.      Highgate is a limited partnership organized under the laws of the state of Delaware, and its principal place of business is in the state of Texas.

3.      Highgate has a multi-tiered ownership structure consisting of limited partnerships, limited liability companies, and trusts, as well as one corporation and several individuals.

4.      None of the individuals in Highgate's ownership structure is a citizen of Massachusetts.

5.      The only corporation in Highgate's ownership structure is a Texas corporation with its principal place of business in the state of Texas.

6.      The trusts in Highgate's ownership structure are all "traditional" trusts (as opposed to "business" trusts). The sole trustee of each and every one of those trusts—JPMorgan Trust Company of Delaware—is a Delaware corporation with its principal place of business in the state of Delaware. All of the beneficiaries of the trusts in Highgate's ownership structure are individuals, and none of those individuals is a citizen of Massachusetts.

7.      Each of the partners in each and every one of the limited partnerships in Highgate's ownership structure is one of the following: (a) another of the limited partnerships in Highgate's ownership structure; (b) one of the individuals referred to in Paragraph 4 of this Affidavit; (c) the corporation described in Paragraph 5 of this Affidavit; (d) one of the trusts referred to in Paragraph 6 of this Affidavit; or (e) one of the limited liability companies whose members are described in Paragraphs 8 and 10 of this Affidavit.

8.      Each of the members in each and every one of the limited liability companies in Highgate's ownership structure is one of the following: (a) another of the limited liability companies in Highgate's ownership structure; (b) one of the one of the individuals referred to in Paragraph 4 of this Affidavit; (c) the corporation described in Paragraph 5 of this Affidavit; (d) one of the trusts referred to in Paragraph 6 of this Affidavit; or (e) one of the limited partnerships whose partners are described in Paragraphs 7 and 9 of this Affidavit.

9.      None of the limited partnerships in Highgate's ownership structure is organized under the laws of the Commonwealth of Massachusetts, or has its principal place of business in the Commonwealth of Massachusetts. None of the partners in any of those limited partnerships is a citizen or resident of Massachusetts.

10.     None of the limited liability companies in Highgate's ownership structure is organized under the laws of the Commonwealth of Massachusetts, or has its principal place of

business in the Commonwealth of Massachusetts. None of the members in any of those limited liability companies is a citizen or resident of Massachusetts.

**Signed under the penalties of perjury this 21st day of December, 2020.**

_Justin Mapes_

_____

Justin Mapes

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December ___, 2020 a true and correct copy of the foregoing document was served by e-mail upon counsel for Plaintiff, as follows:

Lori A. Jodoin, Esq.
lori@theemploymentlawyers.com

_____
Patrick M. Curran, Jr.

45379887.1